**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

**MAGNITE, INC.,**

       *Plaintiff,*

       v.

**GOOGLE LLC,**

       *Defendant.*

Civil Action No. ___1:25-cv-1541___

**JURY TRIAL DEMANDED**

## **COMPLAINT**

1

## TABLE OF CONTENTS

I.   INTRODUCTION.................................................................................... 1

II.  PARTIES.................................................................................................. 5

III. JURISDICTION AND VENUE ............................................................. 6

IV. THE EMERGENCE OF PROGRAMMATIC ADVERTISING
ON THE OPEN WEB.............................................................................. 7

   A.  THE RISE OF THE OPEN-WEB DISPLAY AD TECH ECOSYSTEM ........................................ 7

   B.  HOW AN OPEN-WEB DISPLAY AD IMPRESSION IS SOLD TODAY .................................... 12

   C.  HOW DIFFERENT AD TECH TOOLS COMPETE ................................................ 14

V.  MAGNITE'S ROLE IN THE AD TECH ECOSYSTEM ................................. 15

VI. GOOGLE'S SCHEME TO DOMINATE THE AD TECH STACK AND
EXCLUDE MAGNITE ......................................................................... 18

   A.  GOOGLE USES ITS SEARCH MONOPOLY TO CREATE ADWORDS .................................... 18

   B.  GOOGLE ACQUIRES DOUBLECLICK ........................................................ 19

   C.  GOOGLE LOCKS DOWN THE AD TECH STACK BY TYING ADWORDS TO
ADX AND ADX TO DFP ....................................................................... 20

   D.  GOOGLE INTRODUCES FIRST LOOK TO FAVOR ADX IN DFP ........................................ 24

   E.  GOOGLE ACQUIRES ADMELD ............................................................. 28

   F.  MAGNITE CO-FOUNDS PREBID TO SPUR HEADER BIDDING ........................................ 29

   G.  GOOGLE UNDERMINES THE COMPETITIVE THREAT FROM HEADER BIDDING THROUGH
LAST LOOK AND SUPPLY-SIDE DYNAMIC REVENUE SHARES ........................................ 33

H.   GOOGLE SECRETLY IMPLEMENTS PROJECT POIROT TO FRAUDULENTLY CONCEAL STEERING DV360 DEMAND TO ADX ........................................................................ 38

I.   GOOGLE RESPONDS TO ANTITRUST SCRUTINY BY DROPPING LAST LOOK BUT INTRODUCES UNIFIED PRICING RULES TO ENHANCE ITS ADWORDS-ADX-DFP TIE........... 44

J.   GOOGLE'S ANTICOMPETITIVE CONDUCT GARNERS SCRUTINY FROM ANTITRUST REGULATORS ........................................................................................................ 48

K.   GOOGLE'S ANTICOMPETITIVE CONDUCT ALLOWS IT TO ABUSE ITS SCALE AND NETWORK EFFECTS .............................................................................................. 49

L.   MAGNITE'S AD TECH POSITION TODAY ........................................................... 50

VII.   RELEVANT MARKETS AND GOOGLE'S MONOPOLY POWER ...................... 52

A.   PUBLISHER AD SERVERS FOR OPEN-WEB DISPLAY ADVERTISING ................................ 54

   1.   *Publisher Ad Servers for Open-Web Display Advertising Worldwide Is a Relevant Antitrust Market*.................................................................................... 54

   2.   *Google Possesses Monopoly Power in the Market for Publisher Ad Servers for Open-Web Display Advertising Worldwide*................................................... 55

   3.   *Magnite Is a Nascent Potential Competitor in the Market for Publisher Ad Servers for Open-Web Display Advertising Worldwide*...................................... 56

B.   AD EXCHANGES FOR OPEN-WEB DISPLAY ADVERTISING ...................................... 57

   1.   *Ad Exchanges for Open-Web Display Advertising Worldwide Is a Relevant Antitrust Market*.................................................................................... 57

   2.   *Google Possesses Monopoly Power in the Market for Ad Exchanges for Open-Web Display Advertising Worldwide*.................................................... 58

3.   *Magnite Competes in the Market for Ad Exchanges for Open-Web Display Advertising Worldwide* ............................................................... 59

C.   BUY-SIDE TOOLS FOR DISPLAY ADVERTISING ..................................................... 59

1.   *Buy-side Tools for Display Advertising Worldwide Is a Relevant Antitrust Market* ............................................................................................ 59

2.   *Google Possesses Sufficient Power in the Market for Buy-side Tools for Display Advertising to Constrain Competition in the Exchange Market* ........................................ 61

VIII.   ANTICOMPETITIVE EFFECTS AND ANTITRUST INJURY .............................. 62

IX.   STATUTE OF LIMITATIONS ............................................................................. 67

X.   CLAIMS ALLEGED ............................................................................................ 70

XI.   DEMAND FOR JURY TRIAL ............................................................................. 75

XII.   PRAYER FOR RELIEF ....................................................................................... 76

I.    **INTRODUCTION**

1.    The modern internet runs on digital advertising. Most of the content and services that users access online—news, maps, email, weather, entertainment, and more—are funded not by user subscriptions, but by advertising revenue. That revenue flows through a complex web of interconnected advertising technology products, or "ad tech," run by intermediaries. These tools and platforms facilitate the real-time buying and selling of digital ad space, enabling advertisers to reach users and publishers to monetize their content. Together, they form the backbone of the open web's commercial infrastructure.

2.    But that ad tech ecosystem—the infrastructure that independent publishers rely on to monetize their content—has been captured by a single technology giant: Google. Most people know Google for its overwhelming power in online search, which allows it to control how users find information online.[1] But Google's reach goes further. In addition to controlling online content discovery and distribution, Google also controls the primary means by which content is monetized. Through its illegally maintained monopoly in search, Google controls the largest sources of digital advertising demand because advertisers have no choice but to purchase ads through Google to reach users of general search services.

3.    Google did not earn its privileged position in the ad tech ecosystem through innovation or competition on the merits. Instead, it first bought its way to dominance. Google acquired the most powerful ad tech products early, purchasing the leading publisher ad server (DFP) and a nascent ad exchange (AdX) through its acquisition of DoubleClick in 2008. Then it tied those products to each other and to its dominant advertiser-facing tool, AdWords. Through

---

[1] In fact, a District Court overseeing a separate Department of Justice lawsuit regarding search found that "Google is a monopolist, and it has acted as one to maintain its monopoly" and "has violated Section 2 of the Sherman Act." *United States v. Google LLC*, 747 F. Supp. 3d 1, 32 (D.D.C. 2024).

these interconnected tying arrangements, Google forced publishers and advertisers into an end-to-end ad tech "pipeline" totally under its control.

4.      The subsequent history of the ad tech industry has been that of a back-and-forth struggle between Google and everyone else in the industry (publishers, advertisers, and rivals). Competing ad tech providers in particular have developed technical workarounds—like header bidding—to bypass Google's self-preferencing auction logic and restore competition. But each time, Google responded not by competing on the merits, but by "innovating" new ways to reinforce its monopolies. Specifically, Google restructured auctions to give its own exchange preferential treatment, adjusted pricing rules to disadvantage rivals, and imposed opaque restrictions that made it nearly impossible for independent exchanges to scale. Google had essentially set up an unwinnable game of "whack-a-mole." Each time competitors found a workaround to challenge its dominance, Google shifted the rules, changed the mechanics, or introduced new restrictions to keep control. The outcome was always the same: Google stayed on top while independent rivals competed with each other for the remainder.

5.      Magnite—originally known as the Rubicon Project—is one of those independent rivals that has struggled to compete with Google.[2]  Magnite was one of the earliest entrants in this emerging ad exchange ecosystem. Magnite pioneered technologies to match impressions to demand more efficiently, helping publishers increase yield and reduce waste. Magnite invested heavily in real-time bidding infrastructure, analytics, and auction tools designed to give publishers more control and better outcomes. As programmatic advertising grew, so did Magnite's reputation as a trusted and independent exchange committed to transparency,

---

[2] The Rubicon Project was founded in 2007 and operated one of the earliest ad exchanges. The Rubicon Project completed a merger with Telaria, an exchange focused on connected television and video advertising, and rebranded as Magnite in 2020. The complaint refers to The Rubicon Project and Magnite throughout as "Magnite" for consistency.

innovation, and the long-term health of the open web. But Magnite's ability to win share in open-web display advertising has always been stymied by the fact that Google writes (and rewrites) the rules of the game in its own favor.

6.      Much of Google's conduct occurred behind the scenes, buried in technical restrictions, opaque auction mechanics, and internal policies purposefully hidden from public view. Competing ad exchanges and other ad tech firms struggled to gain traction—not because they offered inferior products, but because they were forced to compete in a system that was rigged behind-the-scenes by Google. Google's dominance, and the hidden levers that it pulled across its technology stack, made it nearly impossible for rivals to grow or scale. Many could not see, let alone counteract, the myriad ways Google was quietly suppressing competition: through auction design, latency controls, data advantages, and artificial restrictions on interoperability. The exclusionary effects were real, but the mechanisms were often invisible. It took years of investigation, expert analysis, and compelled discovery for the full picture to emerge.

7.      Over time, however, evidence of Google's exclusionary tactics drew scrutiny from antitrust enforcers. In December 2020, the State of Texas and several other state attorneys general filed suit against Google, alleging unlawful monopolization in digital advertising. Complaint, *Texas v. Google LLC*, No. 20-cv-00957, ECF No. 1 (E.D. Tex. Dec. 16, 2020). In January 2023, the U.S. Department of Justice and a second coalition of state attorneys general brought their own action, targeting Google's monopolies in the ad tech markets. Complaint, *United States v. Google LLC*, No. 23-cv-00108, ECF No. 1 (E.D. Va. Jan. 24, 2023) ("*U.S. v. Google*") (Brinkema, J.).

8.      The DOJ-led case proceeded to trial first. After a three-week bench trial and extensive post-trial briefing, the EDVA Court issued a detailed opinion finding Google liable

under Sections 1 and 2 of the Sherman Act. The Court's decision, grounded in a comprehensive factual record, confirmed what publishers and rivals had long suspected but could not prove: Google had abused its dominance to protect and expand its monopolies. The Court's Opinion aptly summarized Google's long-running, multi-faceted scheme: "Google conducted anticompetitive tying to maintain its monopoly power, and thereafter engaged in a series of exclusionary acts that compounded harms to customers and competition in the two ad tech markets at issue." *U.S. v. Google*, Dkt. No. 1410 ("Liability Op.") at 104.

9.     The cumulative effects of Google's decades-long exclusionary campaign were so profound that the U.S. Department of Justice and state attorneys general have sought the most severe structural remedies available under antitrust law. In a proposal filed after the EDVA trial, the government called for the divestiture of both AdX and DFP. These are the core instruments of Google's unlawful scheme, and the government argues that they must be separated from Google's control to prevent future violations and to reintroduce real competition to the ad tech markets. The proposal also includes a suite of behavioral and structural remedies: prohibitions on tying and self-preferencing, restrictions on the use of data, required interoperability, and temporary injunctions against Google reentering the divested markets. The breadth of these proposed remedies reflects the magnitude of Google's violations and their centrality to Google's ad tech strategy.

10.    The EDVA *U.S. v. Google* trial also highlighted the ways that Google's conduct directly harmed Magnite. As one of the leading independent exchanges, Magnite was positioned to grow and compete. But Google's exclusionary tactics stifled that potential. By tying AdX to DFP, preferring its own bids from its ad-buying tools, and depriving rival exchanges of critical

scale and data, Google systematically blocked Magnite from competing on a level playing field. The result was a prolonged and compounding loss of business opportunities for Magnite.

11.     But for Google's unlawful conduct, Magnite would have captured significantly more volume, revenue, and market share. Instead, it suffered extensive lost profits and enduring competitive harm.

12.     Magnite brings this action as a follow-on to *U.S. v. Google* to recover the lost profits it sustained due to Google's unlawful monopolization and to seek whatever other relief is necessary to restore fair competition to the ad tech ecosystem. The instant action is directly related to cases brought by two other exchanges in this Court: *OpenX Technologies, Inc. v. Google LLC*, No. 25-cv-01282 and *PubMatic, Inc. v. Google LLC*, No. 25-cv-01482. Magnite does not seek special treatment—only the opportunity to compete on the merits in a market free from artificial restraints. Reintroducing true competition to the ad exchange market will not only help to redress the injuries that Magnite has suffered, but will also benefit publishers, advertisers, and consumers who depend on a healthy, open web.

## II.     PARTIES

13.     Plaintiff Magnite, Inc. is a Delaware corporation with its corporate headquarters and principal place of business in New York, New York. Magnite has offices throughout the United States and around the globe.

14.     Defendant Google LLC is a limited liability company organized and existing under the laws of the State of Delaware. Google is owned by Alphabet Inc., a publicly traded Delaware corporation. Google is headquartered in Mountain View, California and it has offices in Virginia, throughout the United States, and around the globe.

### III.    JURISDICTION AND VENUE

15.    This action arises under the federal antitrust laws, specifically Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

16.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, which vests federal district courts with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States" and 28 U.S.C. § 1337, which vests federal courts with "original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

17.    This Court has personal jurisdiction over Google. Google conducts extensive business in interstate and international commerce, including the marketing, distribution, and sale of advertising technology products and services. Those products are offered to consumers throughout the United States, including within this District.

18.    Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391, because Google transacts business in and is found within this District. Google conducts substantial business in Virginia and this District, including offering, operating, and profiting from the ad tech products at issue in this case. Google has a data center in Loudoun County, and offices in Sterling and Reston, Virginia. As of 2023, Google had over 875 full-time employees in Virginia. Through its pervasive presence in digital advertising markets in this District, Google has harmed Virginia-based publishers, advertisers, and consumers, and has derived substantial revenue from its conduct in this District. Google regularly transacts business in this District and throughout the Commonwealth of Virginia by

marketing, distributing, and delivering digital advertising services across state lines and into the

stream of interstate commerce. Personal jurisdiction and venue are therefore proper in this Court.

## IV. THE EMERGENCE OF PROGRAMMATIC ADVERTISING ON THE OPEN WEB

19.     The internet revolution led to an explosion of free-to-access content. Today,

almost everyone has a library's worth of information in their pocket, accessible at the touch of a

button and at no cost. This once unimaginable reality is made possible thanks to digital

advertising. Publishers and online service providers offer their products for free, and monetize

them by selling ad space on their webpages. This model transformed the open web into the

world's largest and most dynamic marketplace for information and ideas, powered chiefly by

advertising dollars rather than paywalls.

20.     To support this ad-driven model, an ecosystem of "ad tech" intermediaries

emerged to efficiently connect publishers selling ad inventory (the placement of ads on their

webpages) with advertisers seeking to place targeted messages. Ad servers, exchanges, networks,

and demand-side platforms interact "programmatically," often in real time, in order to automate

the matching of ad impressions to drive campaign objectives for advertisers and increase the

value of ad inventory for publishers. The evolution of "programmatic advertising" vastly

increased the efficiency of digital ad transactions. Advertisers saw greater return on investment

by reaching users with more precision, while publishers earned higher revenues because their ad

space became more valuable and they were able to reach more buyers at scale. Those revenues,

in turn, funded the continued production and free distribution of content and services across the

open web.

### A.  The Rise of the Open-Web Display Ad Tech Ecosystem

21.     The first banner ad appeared in 1994 on HotWired.com. Since then, publishers,

advertisers, and ad tech providers have developed myriad ways to advertise to users on the

internet. One such way is through "open-web display ads," which are "display ads that run on websites that use third-party ad tech infrastructure to match advertisers' ads to publishers' inventory." Liability Op. at 21.

22.     As digital advertising on the internet first emerged, the majority of transactions were "direct deals" whereby advertisers purchased ad space in bulk directly from publishers, generally though manual insertion orders. These types of deals worked reasonably well for large publishers that had ample ad space to sell and could afford to employ sales teams trained to negotiate with advertisers. However, direct deals could almost never fill the entirety of a publisher's available ad space, meaning much ad space went unsold. Moreover, many smaller publishers lacked the sophistication or resources to negotiate direct deals.

23.     As the number of websites began to grow, the earliest "publisher ad servers" emerged to help publishers manage and deliver these new ads, which would eventually evolve into what are known today as open-web display ads. A publisher ad server is a piece of software digital publishers use to manage and sell available ad space on their webpages. Modern ad servers both manage direct deals that have been sold by the publisher's sales team and facilitate the provision of ad inventory to intermediaries for programmatic sales. When a user opens a webpage, the publisher's ad server immediately signals to potential buyers that an ad impression is available, pits demand sources against one another to determine in real time which advertisement to deliver, and executes the processes necessary to display the advertisement. They also give sophisticated publishers the ability to manage inventory across numerous webpages, establish minimum price floors, and generate detailed performance reports. For large publishers, these systems are indispensable. Without them, they could not effectively manage or maximize their display advertising revenue.

24.     Publishers generally rely on a single ad server to manage their entire inventory because a centralized system is far more efficient and is typically tailored to each publisher's needs. That customization is costly and labor-intensive, which makes switching to a different ad server uncommon.

25.     By the mid-1990s, the dominant ad server was DART for Publishers. That product later became DoubleClick and then DoubleClick for Publishers ("DFP") after Google acquired DoubleClick in 2008.

26.     Soon after the introduction of publisher ad servers, "ad networks" arrived to streamline the buying and selling of online ad space. Rather than each publisher selling inventory in isolation, ad networks acted as brokers, aggregating unsold ad space from many websites and selling it to advertisers as a consolidated offering.

27.     Ad networks would contract with numerous publishers and then resell their ad impressions in packaged deals to advertisers, often at fixed or pre-negotiated rates. Ad networks improved efficiency over purely direct sales because publishers could fill unsold slots, and advertisers could reach users across many sites without individual deals. But the model had drawbacks. Each network was limited by the amount of advertising demand that they were able to secure, and networks had an incentive to spread this demand across multiple publishers in order to diversify their supply; therefore, only a portion of a publisher's inventory could be filled by a given network. Publishers thus found themselves juggling multiple ad network partners to maximize yield. By the same token, advertisers had to buy from multiple networks to gain sufficient reach, often resulting in duplicate audiences and opaque performance data.

28.     By the mid-2000s, digital publishers sought more efficient, market-driven mechanisms to sell ads on the open web. Initially, network optimizers appeared to help

publishers manage multiple ad network relationships simultaneously. With the advent of real-time bid ("RTB") technologies, these optimizers eventually evolved into supply-side platforms ("SSPs") or "ad exchanges," which introduced true marketplace principles to display advertising.[3] Unlike ad networks (which intermediate sales in bulk or via fixed deals and often take an arbitrage position), an ad exchange is a platform where impressions are auctioned individually in real time to the highest bidder, typically through an automated bidding process. This model was transformative: it allowed advertisers to bid on each impression based on its specific value (e.g. who the user is, what site/page it is, etc.), rather than buying blind bundles of impressions.

29.     Today, ad exchanges operate as the real-time auction houses of digital advertising. They aggregate inventory across multiple publishers and publisher ad networks to create a scaled marketplace. Despite the "sell-side" designation within their "supply-side platform" moniker, ad exchanges actually serve both the sell-side and the buy-side of the open-web display advertising ecosystem. They play the role of essential intermediaries that make modern, large-scale programmatic advertising possible.

30.     Ad exchanges also play a central role in facilitating "programmatic direct" and "private marketplace" ("PMP") transactions. In these "programmatic deals," publishers use the exchange to package and offer inventory to selected advertisers under customized deal terms—such as fixed floors, audience targeting parameters, special unites, or other specifications—while advertisers access the deal through their DSPs. The exchange provides the technical infrastructure that enforces those terms, executes the auction, and handles clearing, reporting,

---

[3] Technology platforms that focused on the sale of publisher ad inventory through real-time bidding were originally referred to as SSPs, but today the term is interchangeable with ad exchanges. For clarity, the Complaint will refer to these platforms as ad exchanges.

and payment. By doing so, exchanges enable publishers and advertisers to run high-value, curated transactions alongside the open auction, giving publishers greater control over pricing and placement and offering advertisers improved brand safety and transparency.

31.      Publishers often seek to maximize the value of their inventory by selling impressions through multiple exchanges, placing those exchanges in competition with one another. To manage that process, publishers initially had to rely on a "waterfall" system in which exchanges were ranked within the publisher ad server by their historical average prices on bids for ad space. Publishers would then offer the impression to one ad exchange at a time based on the ranking until it found an exchange that would meet the price floor the publisher assigned to the exchange. Individual exchanges bidding into a waterfall would be asked if they could meet the price floor and respond with a "yes" or "no." Once the first exchange responded that it could meet the price floor, the ad server would fill the impression before calling exchanges lower on the waterfall ranking. This meant that exchanges lower on the waterfall ranking would never have the opportunity to see the request to place a bid regardless of how much their advertisers might have been willing to bid on the impression. This process favored exchanges that were ranked higher in the waterfall, not only because they had more opportunities to win impressions but also because it provided them data on opportunities they lost. Exchanges understood the importance of being ranked highly in a publisher's waterfall and competed with one another for those higher placements.

32.      On the demand side, specialized tools called "demand-side platforms" (DSPs) emerged to let advertisers and agencies manage programmatic and direct ad buying, to synthesize data about publisher inventory and users, and to bid across many exchanges through one interface. DSPs "provide large advertisers with significant control over the sources of

inventory from which they purchase impressions and how they bid on those impressions."
Liability Op. at 14.

33.     Small and medium-sized advertisers that lacked the sophistication to operate a
DSP or the means to hire ad agencies to operate DSPs on their behalf continued to access ad
space primarily through advertiser ad networks. Over time, these ad networks transitioned to
real-time dynamic bidding and purchased programmatic display ads through exchanges rather
than direct deals with publishers at a fixed price.

34.     The simultaneous rise of exchanges and DSPs catalyzed a transition from the old
network model toward a true marketplace for display ads. Exchanges gave publishers tools to
maximize yield by exposing their inventory to multiple buyers at once, while DSPs allowed
advertisers and agencies to manage campaigns across multiple sources of supply with a single
interface. Together, these tools reduced transaction costs, increased price discovery, and
improved the efficiency of matching each impression with the advertiser willing to pay the most
for the impression.

35.     By the mid-2010s, the ad tech ecosystem had evolved into a sophisticated,
interdependent stack of technologies—publisher ad servers, exchanges, networks, and DSPs—
designed to bring competitive market forces to bear on each individual impression.

**B.  How an Open-Web Display Ad Impression Is Sold Today**

36.     Today, when a user loads a webpage containing an advertising slot, the
publisher's ad server creates an "ad request." That request packages context about the
impression, such as the page's URL, the ad's placement on the page, and information about the
user, such as her device type, geography, privacy and consent signals, and (where permitted)
pseudonymous identifiers. The ad server then applies "auction logic" to determine what to do
with the ad. The auction logic is determined by both the ad server's underlying code and settings

entered into the ad server by the publisher. That logic, for example, determines which direct deals are eligible, which exchanges may compete for the impression, and what price floors or brand-safety constraints apply. The ad server uses that logic to "decide" what to do with the impression. It can fulfill the slot with a direct deal (previously sold on fixed terms through an insertion order) or route the impression to programmatic pipes so multiple sources of demand can bid in real time, including through any "programmatic direct" or "private marketplaces" that the publisher has established.

37.     When the ad server decides to sell an impression through programmatic channels, it will "call" one or more ad exchanges. The ad server transmits the ad request to an exchange, and the exchange then broadcasts a "bid request" for that specific impression to its demand partners.

38.     Those demand partners are buy-side tools—most notably DSPs, but also simplified buying platforms (or ad networks) such as AdWords. They evaluate the bid requests and decide whether and how much to bid for each impression. A DSP ingests the request, applies the advertiser's targeting, frequency caps, brand-safety rules, first- and third-party data, creative eligibility, and budget/pacing constraints, and then uses prediction models to set a bid that maximizes campaign objectives at the lowest cost. The DSP then transmits bids and creative metadata back to the exchange within tight timeouts.

39.     The exchange then steps in again to compare the bids it receives from its buy-side partners and to conduct a real-time auction. The exchange then returns the winning bid (usually net of its fee) to the ad server for final selection.

40.     The ad server compares the winning bids submitted by each exchange that responded with one. It then uses its auction logic to choose the ultimate winner, essentially

conducting another, final auction. The creative is served, the page renders, and the transaction is cleared: the advertiser pays the DSP; the DSP pays the exchange; the exchange remits the publisher's share (less fees). Each layer produces logs and reports that publishers and advertisers use to reconcile and optimize. The entire process of selling and filling an ad takes place in the milliseconds between when a user requests a webpage and the page loads onto the screen.

### C.  How Different Ad Tech Tools Compete

41.     As described above, the sale of an open-web impression is a complicated dance carried out by specialized tools, each designed to perform a distinct function within the ad tech stack. Those different tools each face different competitive pressures based on their unique purposes and the customers they serve. Or at least they would face such pressures if Google permitted fair competition in those markets.

42.     For publisher ad servers, competition centers around the factors that matter most to publishers trying to monetize their inventory. The first and most important factor is the ability to accept bids from key demand sources. Publishers want to make their inventory available to the widest universe of qualified buyers possible to maximize revenue. But the quality of an ad server is also important. Publishers value forecasting accuracy (so they can promise inventory to buyers), latency and reliability (so pages load quickly), granular pricing controls (floors, deal priorities, audience targeting), the ability to easily establish programmatic deals, and transparent, exportable reporting. Lastly, publishers also value neutrality, meaning that the ad server will seek to optimize for the publisher's revenue rather than engaging in self-preferencing to favor the ad tech provider's tools at other points in the stack.

43.     Ad exchanges, in contrast to publisher ad servers, compete on both sides of the market. To attract publishers, they strive for higher net yield through broader, high-quality demand, strong win rates, low latency, robust brand-safety/fraud defenses, and transparent

14

payout and reporting. To attract demand, they offer access to premium inventory at scale in a brand-safe environment, deal tools that enable workflow, and technology to improve match-rates and create bidding efficiency. Pricing, in the form of a "take rate," transparency, and trust are also key differentiators.

44.    DSPs and other display ad-buying tools compete for advertiser and agency budgets on performance (return on ad spend), optimization quality, identity and measurement partnerships, controls and transparency, service and tools, and fees. One key factor is a buy-side tool's breadth and quality of supply integrations. In other words, advertisers want their tools to connect to as many sources of quality impressions as possible to as to find the highest return on investment for the buyer's ad dollars. If a buy-side tool is restricted only to certain channels—for example, due to self-preferencing by a vertically integrated ad tech provider—then it will miss out on more efficient ad-buying opportunities.

45.    The distinct competitive dynamics for publisher ad servers, ad exchanges, and buy-side tools can operate only if competition in those markets is allowed to function without interference. Google's unlawful restraints short-circuited that process. Rather than competing by improving its products, Google insulated itself from market pressure and entrenched its monopoly positions in the ad server and exchange markets by foreclosing rivals such as Magnite.

## V.    MAGNITE'S ROLE IN THE AD TECH ECOSYSTEM

46.    Magnite began its life as the Rubicon Project, founded in 2007 in Los Angeles by a group of entrepreneurs who saw an opportunity to bring more efficiency and transparency to online advertising. At the time, publishers were struggling to manage a growing number of ad networks, which led to elevated integration costs and an inability to properly allocate advertising inventory to maximize revenue. The founders recognized that publishers needed a single

platform to manage demand sources at scale, optimize yield, and restore balance to a marketplace that had become increasingly opaque and fragmented.

47.     Magnite's vision was to build a technology-driven "marketplace for digital advertising" that would allow publishers to consolidate their relationships with multiple buyers and maximize the value of their impressions. From the outset, Magnite branded itself as an open, publisher-centric alternative to the closed, network-driven model that dominated the industry at the time. Its goal was not simply to sell ads but to build a fair, efficient exchange where publishers and advertisers could transact openly.

48.     Magnite's first product, launched in 2007, was a yield-optimization platform designed to help publishers manage their relationships with dozens of ad networks. This platform automatically allocated impressions among competing networks based on performance, ensuring publishers captured the highest possible revenue for each impression. The service quickly gained traction, particularly among mid-sized publishers who lacked the scale to negotiate directly with the largest advertisers but still offered valuable audiences.

49.     Magnite reinvested early revenues into developing the infrastructure for a true exchange. By 2010, it had begun operating a real-time marketplace where display impressions could be sold individually rather than in bulk. This required building systems capable of processing billions of bid requests in milliseconds. The company built out its data centers, engineering teams, and proprietary algorithms to handle the complexity of real-time auctions.

50.     These investments and Magnite's innovation earned it early credibility with publishers. Unlike ad networks, which obscured pricing, Magnite provided publishers with clear reports on pricing, buyer participation, and performance. The ability to better understand the

value of their own inventory was groundbreaking for publishers at the time, and it established

Magnite as a trusted partner rather than just another opaque intermediary.

51.     By 2010, Magnite had emerged as one of the leading independent players in the

evolving exchange landscape. Its platform attracted thousands of publishers and a growing roster

of DSP clients. The company's focus on brand safety, technology investment, and robust

analytics differentiated it from rivals and positioned it as a credible challenger to entrenched

incumbents.

52.     To sustain its growth, Magnite invested heavily in data analytics. It built systems

capable of analyzing impressions across sites and buyers, enabling publishers to more

intelligently set pricing floors and extract greater value from their inventory. These data tools

became another hallmark of the company's offering, reinforcing its reputation for empowering

publishers with actionable intelligence.

53.     Magnite also began forging partnerships with premium publishers, including

major news organizations and media properties. Winning the confidence of such publishers

signaled that Magnite's exchange could be trusted to successfully monetize the most valuable

digital real estate on the open web. These relationships further enhanced the company's

credibility and helped it scale its marketplace.

54.     As the 2010s progressed, Magnite's technical capabilities and publisher reach

positioned it as one of the largest independent ad exchanges in the world. It processed billions of

daily transactions, managed relationships with thousands of websites, and provided advertisers

with broad access to open-web inventory. Magnite's ad exchange was increasingly viewed as a

necessary counterweight to the dominance of Google's AdX, particularly for publishers seeking

more independence and higher yields.

55.      By 2014, Magnite was serving over 500 sellers of digital advertising, including approximately 40% of the U.S. comScore 100 (a list of the top U.S. digital ad sellers by reach). In March of that year, the company went public, raising over $100 million through an IPO.

56.      Yet even in these formative years, Magnite faced challenges that went beyond normal competition. While the company built a strong and innovative business, it was forced to operate in a market already tilted by Google's anticompetitive conduct. Google leveraged its control over the dominant publisher ad server (DFP) and its exclusive access to AdWords demand to deny independent exchanges like Magnite a fair chance to compete.

57.      As a result, despite its early success and credibility, Magnite was never able to realize its full potential. Publishers and advertisers valued Magnite's innovations, but the structural barriers erected by Google's tying arrangements and auction manipulations ensured that Magnite's growth was constrained from the start. Even as it rose to become the largest independent ad exchange, Magnite was competing not on a level playing field but for the limited share of impressions that Google's exclusionary scheme left available.

## VI. GOOGLE'S SCHEME TO DOMINATE THE AD TECH STACK AND EXCLUDE MAGNITE

### A.  Google Uses Its Search Monopoly to Create AdWords

58.      By the mid-2000s, Google had already possessed a monopoly in general search services. As the Federal District Court for the District of Columbia recently ruled in a separate case, *United States v. Google LLC*, Google illegally maintained its search monopoly for nearly two decades through anticompetitive exclusive distribution agreements. No. 20-cv-03010 Dkt.

No. 1033 (D.D.C. Aug. 5, 2024) ("Search Liability Op.").[4] These distribution agreements established Google as the default search provider across the web.

59.    Google leveraged its monopoly in general search services into a monopoly in search advertising. Its AdWords platform—later rebranded Google Ads—was the largest self-service ad buying tool in the world, with over one million advertisers by 2007. AdWords' unique ability to place ads alongside Google's dominant search results attracted a vast pool of small and mid-sized advertisers who overwhelmingly used Google as their sole programmatic buying tool.

60.    As of 2007, Google's publisher-focused display advertising service was limited to AdSense, which placed contextual display ads on third-party websites by matching advertiser keywords to page content. Together, AdWords on the buy side and AdSense on the sell side formed the Google Content Network, "the largest digital ad network in the world." Liability Op. at 26. But Google recognized that AdSense's contextual targeting lacked the auction sophistication and premium inventory access needed to dominate the open-web display market.

**B.  Google Acquires DoubleClick**

61.    To connect its massive AdWords advertiser base with premium open-web display inventory, Google sought control of the leading publisher ad server, which would allow it to create a chokepoint to determine how and to whom ad impressions are sold. In 2007, Google agreed to acquire DoubleClick for $3.1 billion, even though it internally valued the business at $1.8–$2.2 billion. DoubleClick owned the dominant publisher ad server, DFP, as well as a nascent ad exchange, DoubleClick Ad Exchange ("AdX").

62.    Google's $1 billion overpayment was a calculated move to secure DFP's roughly 60% market share and keep the ad server out of rivals' hands. As this Court found, Google

---

[4] Both the DDC action and the EDVA Action have the case title "*United States v. Google LLC.*" Unless otherwise noted, references in this Complaint to "*U.S. v. Google*" refer to the EDVA Action.

understood that "the most important thing in display is having access to the right inventory" and

that "the most strategic battle is about the publisher platform." Liability Op. at 27.

63.        In September 2009, Google relaunched AdX as "AdX 2.0" with RTB capability.

This launch laid the groundwork for Google's subsequent tying, auction manipulation, and

foreclosure strategies.

**C.  Google Locks Down the Ad Tech Stack by Tying AdWords to AdX and AdX to DFP**

64.        After launching AdX 2.0, Google embarked on an exclusionary campaign to make

it the dominant ad exchange in the world. Google organized its campaign based on the two-sided

nature of the exchange market. In open-web display advertising, the buy-side is relatively more

elastic, because some advertisers (particularly larger ones) can shift spending to walled-garden,

in-app, or social media display ads. The sell-side, on the other hand, is inelastic and "sticky,"

because open-web publishers have fewer options for monetizing their ad space.

65.        Google thus devised a strategy of using its buy-side tools to provide scale to AdX.

In doing so, Google specifically focused on a segment of the buy-side demand that is less elastic:

AdWords advertisers. It then tied AdX to DFP to convert AdX's scale into monopoly power in

the markets that serve the sell-side: ad exchanges and ad servers. Finally, Google engaged in a

cat-and-mouse game of anticompetitive actions to enhance its tying arrangements and to fend off

efforts to bypass them.

66.        Google's exclusionary campaign began with two interconnected tying

arrangements. The Court in the EDVA *U.S. v. Google* case succinctly described them and how

they worked together:

> After acquiring DoubleClick, Google implemented two policies that
> incentivized both advertisers and publishers to use AdX. First, with
> limited exceptions, Google made AdX the only exchange into which
> AdWords advertising demand was permitted to bid [the AdWords-
> AdX Tie)]. Second, Google required publishers to use DFP as their

ad server if they wanted to access real-time bids from AdX [(the
AdX-DFP Tie)].

Liability Op. at 28.

67.      First, starting in 2009, Google required AdWords advertisers to use AdX to

purchase open-web display ads. This "AdWords-AdX Tie" coerced AdWords advertisers,

because although it would theoretically have been possible for them to use Google's platform

only for search and to route their display advertising spend through other exchanges, that was not

realistic. AdWords' advertisers included millions of companies, "including countless small and

medium-sized businesses." Liability Op. at 29. The vast majority of those advertisers were not

sophisticated enough or lacked the resources necessary to employ ad agencies or to use DSPs to

optimize spend across multiple exchanges. Those advertisers made their display advertising

purchases solely through AdWords, and the AdWords-AdX Tie thus made them dependent on

AdX to reach open-web display inventory.

68.      The AdWords-AdX Tie, however, was not enough on its own for Google to

monopolize the sell-side ad tech markets. If Google forced AdWords advertisers to bid only

through AdX but AdX was fully reachable through any ad server on equal terms, then publishers

could still set a competitive field across exchanges and thereby discipline AdX's fees and quality.

The AdWords-AdX Tie would thus have only succeeded in raising AdWords advertisers' costs

(by limiting access to inventory) and the effect of increasing Google's market power on the sell-

side would have been far less. Google had to implement a second tie, the "AdX-DFP Tie," to

make the exclusionary scheme work.

69.      The AdX-DFP Tie consted of Google forcing publishers to use DFP if they

wanted to receive real-time bids from AdX. Google required independent ad servers to use a

crippled "AdX Direct" tag, which offered only static, pre-set price floors, provided no visibility

into actual bid prices, increased latency, and blocked publishers from placing AdX bids into live competitions against other exchanges. As the EDVA Court found, AdX Direct was "not an economically viable substitute to accessing AdX through DFP." Liability Op. at 28 n.16. Because AdX was the only exchange that Google permitted AdWords advertisers to bid into, "AdX became the 'glue that seal[ed] DFP' inventory to AdWords demand." Liability Op. at 28 (quoting a 2009 internal email from Neal Mohan, then a Senior Vice President of Display and Video Ads at Google).

70.      The AdWords-AdX Tie had made AdX a "must-call" for open-web publishers, and the AdX-DFP Tie thus made DFP a necessity for those same publishers. While there were other ad networks and advertisers who bought through alternative buy-side tools, AdWords represented a uniquely large and diverse segment of advertiser demand. The ties thus compelled publishers to adopt Google's ad server, a choice that would become virtually impossible to reverse.

71.      Internal communications revealed in the *U.S. v. Google* trial prove that the purpose of Google's ties were anticompetitive. The purpose of the AdWords-AdX Tie in particular was to create an artificial advantage for AdX. For example, one Google document described AdWords' exclusivity on AdX as "purely [a] decision to hold back a set of advertisers in order to promote [AdX]." Another described the policy as having: "chosen to limit [AdWords] to buying only on AdX, an exclusivity that makes AdX more attractive to sellers." One Google product manager described the policy bluntly: "Our goal should be all or nothing. Use AdX as your SSP or don't get access to our demand."

72.      Other Google internal communications show that Google created the AdWords-AdX Tie and continued it for more than a decade despite knowing that it made AdWords a worse

product. One of the benefits touted by independent, third-party buy-side tools was their ability to bid into multiple exchanges to find the best performing inventory. Again and again, Google's employees on the buy-side of the business argued for allowing AdWords the same ability to bid into independent exchanges. For example, one employee wrote that the restriction "greatly weaken[ed] [AdWords'] position in the market." Another wrote that "[f]rom [AdWords'] perspectives, [AdWords] is competitively disadvantaged against buy-side competition" because "[w]e are artificially handicapping our buy-side, [AdWords], to boost the attractiveness of our sell-side, AdX." And another reiterated that AdWords "needs to be cross-exchange competitively," meaning that it needed to bid on more than one exchange to remain competitive.

73.    Internal Google documents also made clear the purpose of the AdX-DFP Tie component of its scheme was so that: "AdX can serve as a tool to pull publishers onto DFP." But the anticompetitive effects of the AdX-DFP Tie also reverberated *back* into the exchange market, compounding the direct competitive harms associated with the AdWords-AdX Tie. The reason is that one of the ad server's key roles is to pick the winning exchange for each impression. Google capitalized on its ad server dominance by creating built-in advantages for AdX within DFP's auction logic (the rules that DFP used to solicit and choose among bids for any given impression). Because almost all open-web publisher inventory was going through DFP, these advantages dramatically undermined the competitiveness of competing exchanges, such as Magnite. And whenever those independent exchanges tried to innovate or promote new competitive paradigms to overcome Google's advantages, Google tweaked DFP's auction logic to preserve AdX's dominance. Through this cat-and-mouse game, Google evaded attempts to undermine the AdWords-AdX-DFP Ties and to reintroduce competition in the exchange market.

**D. Google Introduces First Look to Favor AdX in DFP**

74.     After locking publishers into its ad tech stack through the AdWords-AdX-DFP Ties, Google took the next step to enhance AdX's market power: it hard-coded a preferential auction advantage for AdX into DFP.

75.     Google's preferencing of AdX within DFP grew out of feature called "Dynamic Allocation," which changed how impressions were allocated among competing sources of demand. Traditionally, guaranteed line items sold directly to advertisers were prioritized above non-guaranteed sources such as ad networks or exchanges. Dynamic Allocation altered this framework by allowing multiple line items to compete against one another in real time, so that indirect demand sources like AdX or third-party networks could win impressions if they were willing to pay more than the price associated with a publisher's direct-sold campaign.

76.     In principle, the Dynamic Allocation feature promised to maximize publisher yield by ensuring that every impression went to the highest-paying source, whether from a guaranteed direct deal or programmatic demand. In practice, however, Google used Dynamic Allocation as a tool to favor its own exchange, AdX.

77.     Google gave AdX privileged access to compete against direct-sold campaigns and against other networks within DFP. At the same time, Google arbitrarily denied rival exchanges the same opportunity to bid in real time. As a result, AdX was uniquely able to see the impression, compare it to the prices of competing line items, and win if it offered even slightly more. This built-in advantage became known as Google's "First Look."

78.     Under First Look, whenever a publisher's ad impression became available, DFP would first give AdX the opportunity to bid in real time before any other exchange or ad network could compete. If AdX had any advertiser willing to pay at or above the publisher's floor price

(or at or above the price of any other line item in the ad server) AdX could take the impression immediately, bypassing competition altogether.

79.     Before Google acquired DoubleClick, DFP gave publishers more control over their auctions, including the ability to share DFP-assigned user IDs with any ad exchange or buying tool to improve match rates and targeting. After the acquisition, Google reconfigured DFP to prohibit publishers from sharing those IDs with non-Google exchanges and buying tools, while continuing to share them with AdX. This change degraded the ability of rival exchanges to identify and value impressions accurately, while preserving that capability for AdX alone.

80.     First Look further amplified this advantage by giving AdX visibility into the predicted bids (or price floors) assigned to every other demand source in the waterfall. These predicted bids were based on static, historical data—not real-time competition—and were passed to AdX before the impression was offered to any rival. AdX would then run a real-time auction using this inside information and could win simply by matching or slightly exceeding the top predicted bid. If AdX could not beat the first predicted bid, DFP would repeat the process with the second-highest demand source, again allowing AdX to snipe the impression before any rival's real-time bid was considered.

81.     The EDVA Court in *U.S. v. Google* provided an example of how First Look functioned and how it deterred advertisers from using other ad exchanges, such as Magnite's:

> For example, if AdX offered $1.07 CPM for an impression, and that amount met or exceeded the publisher's floor price for the impression, AdX would win the auction before any other exchanges' bids were examined, even if other exchanges were offering $1.10 CPM and $1.08 CPM for the same impression. Thus, under First Look, advertisers using AdX could win the auction even if they did not offer the highest revenue for the impression. This inherent inefficiency limited the ability and incentive for advertisers using other ad exchanges to compete on price, and resulted in publishers not obtaining the maximum value for their impressions.

Liability Op. at 30 (citations omitted).

82.     DFP denied other exchanges the ability to compete in real time. When rival exchanges asked Google to integrate their real-time bids into DFP—changes that would have increased publisher revenues—Google refused. As a result, AdX alone benefited from real-time bidding within DFP, while rivals were relegated to static, delayed auctions that could not compete on equal terms.

83.     This rigged auction design allowed AdX to cherry-pick the most valuable ad requests, leaving only lower-value ad impressions to flow down the waterfall to competing exchanges. Over time, this created a vicious cycle: rivals' average win prices declined, causing publishers to lower the predicted bids for those rivals, which in turn lowered the price floors AdX had to beat. AdX's higher win rate also gave it access to more auction data, enabling it to refine its bidding algorithms faster than rivals and further entrench its lead. This cycle also impacted rival exchanges' relationships with advertisers; advertisers felt that they could only gain access to desirable inventory by purchasing through AdX, because rival exchanges could not win valuable impressions when competing with AdX.

84.     First Look caused competitive harm to rival exchanges beyond allowing AdX to win opportunities its rivals might have won with a higher bid. One of the most important effects of First Look was that it prevented rival exchanges from seeing impressions and *losing*. Exchanges optimize their bidding algorithms and technology by assessing both their wins and losses on opportunities to better predict what prices are needed to win future impressions. Accordingly, exchanges still benefit by seeing an impression and losing because they gain valuable data. First Look was designed to prevent rival exchanges from ever seeing impressions that they might have otherwise seen in a publisher's waterfall, including impressions that they

would not win, which denied those rivals important data to use for future impressions. In contrast, AdX had a full view of real-time information about every impression and DFP provided AdX the predicted bids of all other demand sources in the publisher's waterfall. No other exchange was ever provided this kind of information by DFP.

85.     Over time, First Look made it easier for AdX to win impressions and deny rivals the opportunity to compete or gain useful data about impressions being sent out by publishers. Without access to the revenue or data they would have gained from these impressions, rival exchanges struggled to compete with AdX, widening the gulf between AdX and all competing exchanges. Magnite and other exchanges constantly attempted to innovate and improve their products, but they were effectively left to compete only amongst themselves because they could not overcome AdX's massive advantages gained by the tie to DFP.

86.     Publishers could not turn First Look off, and many were not even aware of how it operated or how it harmed them. Internal Google documents acknowledged that "AdX received a First Look at DFP impressions even if the publisher preferred other exchanges and wanted to rank them first," and that First Look "made it difficult for [rival ad exchanges] to compete on a level playing field with AdX."

87.     The Court in *U.S. v. Google* recognized that First Look introduced "inherent inefficiency" to DFP that "limited the ability and incentive for advertisers using other ad exchanges to compete on price, and resulted in publishers not obtaining the maximum value for their impressions." Liability Op. at 30. The Court further found that First Look "impeded [rivals'] ability to enter the market, grow, and compete," gave Google a "data advantage" for training AdX's auction models, and "constituted anticompetitive conduct" that "resulted in less revenue for publishers, fewer impressions going to the advertisers who were willing to pay the

most for them, enhanced AdX market power, and reduced competition in the ad exchange market." *Id.* at 31, 99, 108.

**E.  Google Acquires AdMeld**

88.      In 2011, Google acquired AdMeld, a leading "yield management" platform that many publishers relied on to optimize revenue from ad networks and early exchanges. AdMeld offered publishers valuable tools to compare and manage multiple sources of demand. Publishers widely regarded it as an independent check on Google's growing dominance. One of AdMeld's most important features allowed publishers using non-Google ad servers to obtain real-time pricing from AdX. That capability was a threat to Google's AdWords-AdX-DFP Tie, so Google shut it down.

89.      Rather than support a feature that expanded publisher choice, Google quickly moved to eliminate it. Internal documents acknowledged that keeping the functionality would have required little engineering effort and would have benefited publishers, but Google nevertheless shut it down.

90.      The decision to strip out this procompetitive feature was consistent with Google's broader strategy of selectively integrating or deprecating features in ways that preserved its ties across AdWords, AdX, and DFP. Whenever a product innovation threatened to loosen those ties or give publishers greater flexibility to transact outside Google's stack, Google disabled it. AdMeld's fate thus exemplified Google's practice of buying promising technologies not to improve competition, but to neutralize them as competitive threats.

91.      The AdMeld acquisition also gave Google another channel of control over publishers, many of whom had adopted AdMeld precisely to help them diversify away from Google's stack. Instead, once under Google's control, AdMeld became another mechanism

through which Google steered transactions toward DFP and AdX, depriving publishers of independent tools and reinforcing the very lock-in that AdMeld had been designed to mitigate.

### F. Magnite Co-Founds Prebid to Spur Header Bidding

92.     After years of growing frustration, publishers and independent ad tech companies began searching for ways to counter Google's stranglehold on the open-web ad pipeline. The result was a watershed innovation known as "header bidding," which emerged around 2014–2015 as a pro-competitive workaround to Google's entrenched position.

93.     Header bidding was essentially a "hack" designed as a workaround to Google's First Look advantage. Instead of relying solely on DFP to call exchanges in sequence (which artificially favored AdX), publishers could insert a piece of JavaScript code (typically referred to as a "header bidding wrapper") on their webpages that simultaneously solicited bids from multiple exchanges as the page loaded. Header bidding allowed publishers to control which exchanges would be called for ad impressions on their webpages without intervention from Google because the process was run on the webpage itself before the publisher would call the ad server.

94.     In a typical header bidding setup, when a user visits a website, the header code reaches out to several exchanges at once (*e.g.*, Magnite, Index Exchange, OpenX, PubMatic, AppNexus, etc.). The header bidding code would then process a mini-auction among those exchanges and send the winning bid into DFP. Critically, the header bidding code would enter that winning bid into DFP as if it were a guaranteed campaign or a high-priority line item with a price floor equal to the bid. Through this workaround, AdX now had to beat the highest external bid to win the impression, rather than simply take it by default through First Look. Header bidding did not eliminate Google's other advantages, because DFP still ran the final definitive auction, but it tempered the effect of First Look; while Google could still cherry-pick valuable

29

impressions that it wanted, the cost was much higher for AdX because competing rival exchanges were submitting higher bids through header bidding auctions than the predicted floor prices Google had to beat under First Look.

95.      From Magnite's perspective, the emergence of header bidding was both an opportunity and a potential threat. By 2014, Magnite operated one of the leading independent ad exchanges. Although it was dwarfed by AdX, the Magnite exchange enjoyed the trust of major publishers, and it was often listed relatively high in the waterfall. That meant that whenever AdX decided not to take an impression after its First Look, Magnite's exchange was often well-positioned to win that impression. As header bidding moved the industry away from the waterfall, Magnite faced greater competition from other independent exchanges for the impressions that AdX did not take. As digital publishers rushed to implement header bidding, Magnite also decided to embrace header bidding and to develop solutions to increase its effectiveness and to speed its adoption.

96.      Magnite began, like several other industry participants, by developing its own proprietary "header bidding wrappers" for publishers to use. The proliferation of proprietary wrappers, however, threatened to undermine the efficacy of header bidding. Each wrapper performed the same basic functionality, but their proprietary nature meant that exchanges would need to optimize for each header bidding wrapper used by their publisher customers. This process required substantial effort from exchanges but did not provide publishers with any benefit because the different proprietary header bidding wrappers were all largely performing the same function.

97.      Industry participants, including Magnite, thus began collaborating to create an industry-wide open-source project called Prebid to support header bidding's growth. Magnite co-

founded Prebid.org with AppNexus in 2017, and Magnite has been a leading proponent of open-source, transparent ad tech solutions ever since. As former Rubicon Project (Magnite) President and CEO Michael Barrett explained in 2019:

> After years in which Google grew and grew while the rest of us peddled our own 'secret sauce', it's clear that going it alone can only get us so far…. [A]d tech's black-box era is giving way to one in which companies collaborate on shared interests so they can focus on competing in areas that are genuinely strategic. The best example of this is Prebid, the open source project that in two years has grown from a fledgling experiment to the industry's leading independent, header-bidding framework.

Michael Barrett, "The Dawn of Ad Tech's Open Source Era," AdExchanger (Oct. 25, 2019), https://www.adexchanger.com/data-driven-thinking/the-dawn-of-ad-techs-open-source-era/.

98.     Under Magnite's leadership, Prebid and header bidding quickly gained traction. Prebid and its software, Prebid.js, saw widespread adoption among industry participants. The standardization provided by Prebid's solutions meant that ad exchanges could devote resources to optimizing their bids and auction process that had previously been devoted to ensuring their exchange could work with multiple header bidding wrappers.

99.     Today, nearly every major industry participant is a member of Prebid, including exchanges, DSPs, and publishers. Google, however, has repeatedly declined invitations to join Prebid. Prebid members contribute to developing and maintaining Prebid's open source software, but the organization's structure and transparency prevent individual members from gaining outsized influence in any changes or updates to the software to prevent self-dealing. Magnite has maintained an active presence in Prebid since its founding and has served as its Board Chair since its inception.

100.    From Google's perspective, this was a dangerous development. Internally, Google recognized that header bidding was a "no-brainer for a publisher to adopt" given the revenue

uplift. Top Google ad executives saw it as an "existential threat" to their ad tech empire, because header bidding could erode both AdX's volume and the supremacy of DFP if publishers found a partial way to route around Google's rules.

101.    During this period, Magnite and other independent exchanges experienced a glimmer of opportunity. Header bidding created a new playing field where a company like Magnite could compete with rival independent exchanges to win some impressions it previously had no chance of winning. Header bidding also allowed Magnite to view countless more impressions than it had access to under First Look, meaning Magnite could scale up efforts to optimize its bidding because Magnite was now seeing important information on impressions whether it was winning or losing the auction. Moreover, the ethos of header bidding—transparency and fairness through open technology—aligned with the industry's goal of improving marketplace transparency and competition. Magnite also continued to invest in tools to help publishers adopt header bidding. For example, in 2019 it launched a product called Demand Manager based on Prebid to simplify header bidding for publishers.

102.    The broader industry's collaboration around Prebid and header bidding demonstrated that cooperation on an open standard could challenge a dominant firm's closed system, while also stimulating vigorous competition among the independent players. Indeed, the growth of header bidding was actually a double-edged sword for independent exchanges. It meant they had to compete more forcefully against each other to win impressions because competition now took place in real time, rather than in a sequential waterfall inside the ad server based on historical pricing. But that dynamic was a bargain worth taking because it at least created the potential for competing more fairly against AdX by dulling the effect of First Look.

Google, however, quickly sought to undermine the new competitive dynamic and reestablish the privileged position of AdX in the ad tech stack.

### G. Google Undermines the Competitive Threat from Header Bidding Through Last Look and Supply-Side Dynamic Revenue Shares

103.    Google quickly responded to header bidding with a mix of public and covert tactics to undermine the competition and to preserve AdX's monopoly. One response was a product called "Exchange Bidding" (later termed "Open Bidding") that Google introduced in 2018. Exchange Bidding was essentially Google's imitation of header bidding but executed within DFP on Google's terms. It allowed a few approved third-party exchanges to bid alongside AdX within the DFP auction, purportedly to create a unified auction.

104.    Exchange Bidding, however, was a poor substitute for client-side header bidding. Google imposed a mandatory 5% fee on all bids from independent exchanges and subjected them to other disadvantages, such as increased latency and less data visibility. Google also decided which ad requests to make available to independent exchanges. AdX did not pay the 5% fee, which effectively reduced the price it needed to bid to win an auction. Internally, Google was candid that Exchange Bidding was designed to "stem the bleeding." In other words, Google introduced it to blunt publishers' incentives to use header bidding by bringing (and controlling) multi-exchange auctions inside its platform. By charging competing exchanges a fee and keeping the auction mechanics opaque, Google ensured that AdX retained its artificial advantage.

105.    Magnite resisted participating in Exchange Bidding because it so favored Google. But it ultimately relented and was forced to participate beginning in 2018.

106.    Despite Google's efforts to steer publishers into its owned-and-operated header bidding alternative, publishers increasingly implemented independent header bidding solutions to diversify away from AdX. Google responded by implementing a new form of auction rigging

within DFP known as "Last Look." Through its control of DFP, Google allowed AdX—and only AdX—a final opportunity to see and beat the winning bid from a header bidding auction before the impression was awarded.

107.    The mechanics were simple but powerful. Google refused to have AdX participate in header bidding auctions. When a publisher used header bidding and the winning bid from an outside exchange (e.g., Magnite) was passed into DFP, Google would treat that bid as a price floor. AdX was then informed of the price and allowed to bid after the header bidding auction had closed. With this knowledge, AdX could outbid the winning exchange by just a penny. For example, Google could bid $5.01 to beat a $5.00 bid, thus sniping impressions without having to win a fair auction. Competing exchanges were denied the ability to respond and had no visibility into the manipulation. AdX's competitors, bidding in real time through header bidding, had no information about their rivals' bids, which meant that AdX had a significant informational advantage because it knew the price of the winning bid from the header bidding auction.

108.    Offering a single preferred exchange a Last Look at impressions makes no economic sense from the perspective of an independent publisher ad server. Doing so introduces inefficiencies that lowers publishers' revenues because the favored exchange can win impressions at a lower price than it would bid if it lacked inside information about its rivals' bids. But for Google, which controlled the dominant ad server *and* exchange, Last Look made perfect economic sense because it significantly undermined the competitive threat posed to AdX by header bidding.

109.    Google's Last Look undermined publishers' revenues and harmed rival exchanges. Because AdX could wait and snipe winning bids, it had little incentive to bid its true value up front. The result was lower overall bid competition and suppressed prices. At the same

time, the distorted auction prevented legitimate winners like Magnite from securing impressions they had fairly won, draining them of scale and revenue. As this Court found: "Being able to view its competitors' bids provided Google and its advertising customers with a significant informational advantage that significantly disadvantaged other competitors in the ad exchange space." Liability Op. at 35. Publishers could not turn Last Look off. From Google's perspective, Last Look made perfect sense—it entrenched AdX's market position and stunted the growth of emerging competitors.

110.    The essence of Last Look was that Google used an informational advantage from DFP to win impressions for AdX at artificially low prices. Google also used this advantage to secretly implement another pricing scheme, which it internally referred to as "Sell-Side Dynamic Revenue Share" ("SSDRS").

111.    Beginning in or around 2014, Google automatically opted publishers into SSDRS without disclosure, and by late 2015 all AdX publishers were subject to it. In 2016, Google told publishers it was launching a "revenue share-based optimization" that would increase publisher yield. In truth, SSDRS did not increase publishers' net revenue. Any "discount" in AdX's take rate on competitive impressions was offset by higher take rates on other impressions, allowing Google to recoup the difference and leave publishers no better off overall.

112.    Under the traditional model, AdX took a fixed percentage cut (often 20%) of advertiser payments as its fee. SSDRS meant AdX would vary its fee on a per-impression basis: AdX lowered its take rate when it was necessary to win an auction, but it then recouped that "discount" by raising its take rate when competition for an impression was low. The AdX discounts and overcharges were calculated to balance out so that customers, who could only see the aggregate take rate, would have no way of knowing what Google was doing.

113.    SSDRS worked in tandem with Last Look to steer impressions to AdX. In practice, if a header bidding exchange returned a high bid for an impression, AdX could respond in two ways. First, it could use Last Look to know the rival's price. But that was only effective if AdX had a higher bid to offer. The second step was then for AdX to use SSDRS to charge a lower take rate so that its net bid (minus the fee) would just barely beat the rival. For a particular impression, AdX could use Last Look to discover that Magnite bid $4.50 CPM (cost per thousand). If AdX's highest advertiser bid for that same impression was $5.00 CPM, then its net bid for that impression (minus the 20% fee) would be $4.00 CPM, and it would lose the impression. But if AdX dynamically lowered its fee for that impression to 9%, then it could offer a winning bid of $4.55 CPM.

114.    The AdX pricing scheme did not redound to the benefit of AdX's publishers in aggregate, because Google would recoup the discounted fees on other impressions where it knew it had the winning bid. The only effect was to benefit AdX at the expense of other exchanges based on its preferential tie-in to DFP. That is why a Google engineer described SSDRS bluntly as "just yet another way for AdX to exploit the last look advantage," allowing AdX to "pay high and win whenever [a rival exchange] is present … and pay low when [the rival] bids low." Liability Op. at 104.

115.    That same engineer pointed out that a competing exchange "in contrast can't reliably save money on queries where AdX bids low, because it doesn't know AdX bids." *Id.* The Court in *U.S. v. Google* reiterated the point that "[b]ecause third-party exchanges did not have Last Look to 'see all the bids' and vary their take rate accordingly, they lost scale and revenue from AdX's use of sell-side dynamic revenue share." Liability Op. at 36. In other words, Magnite

and other exchanges could not replicate SSDRS without suicidal fee cuts on blind bids that AdX could still snipe via Last Look.

116.    Publishers typically rank bids by the revenue they will receive net of any fees collected by the bidding exchanges, so lowering Google's take rate made AdX more likely to win an impression even if its advertiser buyers were not willing to outbid advertisers using rival exchanges. Rival exchanges could not recreate such a dynamic pricing model because they did not have information on their competitors' bids to inform the decision of when to lower or raise their take rate. This meant that AdX was able to use the information advantage provided by the DFP-AdX Tie to win more impressions and prevent its rivals from gaining share and scale to challenge its dominance.

117.    Not only could other exchanges like Magnite not replicate SSDRS, they did not know it was happening. Google deliberately concealed the program's existence from other exchanges and even publishers. Because DFP withholds losing bid information from publishers, they could not detect that AdX was selectively lowering fees to win certain impressions while raising them elsewhere to make up the shortfall. Google's reports to publishers showed only their average fee, not the distorted impression-by-impression fees. This concealment prevented publishers from knowing SSDRS existed, and consequently it deprived publishers of the opportunity to evaluate whether SSDRS was in their interests. It also prevented rival exchanges from responding competitively.

118.    The combined effect of Last Look and Sell Side Dynamic Revenue Share was devastating to competition. Together, they effectively neutralized header bidding's core benefit: even when an independent exchange found a buyer willing to pay top dollar, Google could leverage information and fee manipulation to snatch the deal.

37

### H. Google Secretly Implements Project Poirot to Fraudulently Conceal Steering DV360 Demand to AdX

119.     In 2017, Google embarked on another secret campaign to protect AdX's dominance, internally codenamed "Project Poirot," which deliberately reduced bids coming from Google's own DSP (Display & Video 360 or "DV360," formerly DoubleClick Bid Manager or "DBM") for impressions arriving through rival exchanges.

120.     DV360 is an advertiser-facing tool used by sophisticated brands and agencies to buy digital ad inventory across the open web. It is one of the largest DSPs in the market and serves as a critical gateway to billions of dollars in programmatic advertising demand. For publishers and ad exchanges, access to DV360 demand is essential: it brings high-quality campaigns, large budgets, and consistent bid volume.

121.     Project Poirot was the result of a series of meetings where Google considered a range of options to stunt the growth of transactions on rival ad exchanges in the face of increasing header bidding adoption. Originally, Google considered having DV360 cease bidding outside of AdX entirely for impressions that were offered by publishers that were using header bidding. But when Google realized that strategy was not technically feasible, it settled on an alternative strategy of DV360 lowering bids for *all* impressions offered by exchanges engaged in header bidding.

122.     Google claimed at trial in *U.S. v. Google* that Project Poirot was merely a "bid-shading" technique. "Bid-shading" programs primarily arose as a result of the transition from exchanges using second-price auctions to first-price auctions. In a second-price auction, the winning bid price is typically set based on the price of the second-highest bid, whereas in a first-price auction the high bidder pays its bid price regardless of the second-highest bid. Bid-shading programs analyze particular impressions and adjust bids accordingly to protect advertisers from

potentially overpaying in a first-price auction by automatically lowering their bids to compensate for these auction dynamics. The advent of header bidding (and Google's adoption of Last Look) accelerated an industry trend of exchanges moving to a first-price auction. Because first-price auctions typically resulted in higher winning bids clearing an exchange it was more likely that an independent exchange using first-price auctions would be able to win an impression against AdX despite its built-in advantages. Some exchanges offered bid-shading algorithms to their DSP clients to help them compensate for the transition to first-price auctions. Magnite, for example, introduced a product called Estimated Market Rate ("EMR"), an optional free tool that helped buyers compete in a first-price auction environment and maximize budgets by looking for opportunities at the impression level to reduce a buyer's first price bid with minimal impact on win rates. Notably, DV360 typically refused to participate in exchanges' bid-shading programs, including EMR.

123.    What made Project Poirot different from legitimate bid-shading algorithms was that it did not operate at the impression level and take into account the specifics of a particular impression to determine the appropriate amount of shading to maximize an advertiser's return on investment ("ROI"). Instead, DV360 systematically reduced bids on *all* impressions offered for sale by exchanges engaged in header bidding. This fundamental difference meant that Project Poirot was not designed to protect advertisers from overpaying in individual auctions but to punish rival exchanges by making their auctions less competitive. By indiscriminately lowering bids across entire categories of transactions, Google ensured that DV360 bids into header bidding exchanges cleared at artificially low prices or failed to clear at all. The result was that fewer impressions flowed through those competing exchanges, while AdX remained immune from Project Poirot's effects and captured the diverted transactions. Far from functioning as a

tool to optimize advertiser returns, Project Poirot functioned as a weapon to starve rival exchanges of scale and reinforce AdX's dominance.

124.     Google attempted to cloak this exclusionary conduct under the label of protecting advertisers, but the record shows otherwise. At trial in *U.S. v. Google*, Google proffered the justification for Project Poirot that it was designed to protect advertisers from "dirty auctions" during the transition away from second-price auctions. But economic reality and Google's own documents and actions reveal that justification to be pretextual.

125.     First, by the time DV360 implemented Poirot, almost every significant exchange (including Magnite) had already moved to first-price auctions. Other DSPs successfully adapted without reducing their spend on those exchanges. Advertisers and DSPs did not object to the move to first-price auctions because it was partially a response to advertisers demanding more transparency. Second-price auctions can allow exchanges to arbitrage bids; because the winning bidder could not see the actual second price bid, they could not be sure their exchange was charging them the correct price or taking a cut of the difference between the first and second price bid. Bid-shading programs implemented by other DSPs shaded bids on an impression-by-impression basis rather than reducing spend across the board on exchanges that were running first-price auctions. This makes sense because the goal of a DSP should be to maximize advertisers' ROI, and independent DSPs would not benefit from reducing their spend on independent exchanges. In contrast, Google had a clear motivation for reducing DV360's spend on independent exchanges through reducing all bids into targeted exchanges (rather than bid-shading on individual impressions) because it owns AdX, the direct beneficiary of Project Poirot's bid-shading. If Google's justifications for Project Poirot were accurate it should have had similar effects on exchanges as the bid-shading programs of rival DSPs, but instead it almost

exclusively favored AdX at the expense of other exchanges. Moreover, AdX itself had moved away from being a pure second-price auction. Internal documents revealed in the *U.S. v. Google* trial show Google recognized that AdX's auction design mechanics made it behave more like a first-price auction.[5] If Poirot was motivated by a concern over first- vs. second-price auctions impacting advertisers, DV360 would have shaded its bids into AdX as well. But DV360 did not shade bids into AdX until 2019 (after it was subject to antitrust scrutiny). Prior to that, Poirot only applied to independent exchanges.

126.    Second, Google's internal documents first revealed at trial in *U.S. v. Google* demonstrate the goal of Poirot was not to protect advertisers or improve efficiency, but to shift spend back to AdX and weaken rival exchanges. Google tracked the effects of Poirot not by measuring improvements to advertiser ROI, but by monitoring revenue gains for AdX and corresponding declines for competitors. In an internal discussion focused on combating header bidding, a Google employee reflected "Poirot has actually been quite effective, resulting in DBM [DV360] spending 7% more on AdX and reducing spend on most other exchanges." Internal reports celebrated increased advertiser spend on AdX and the loss of volume on other platforms as evidence of success. Indeed, in an internal email falsely labeled as "Privileged and Confidential" in an attempt to protect its contents from disclosure, a Google employee wrote that "Poirot currently generates margins by shifting inventory to AdX (outcome of Poirot)." Far from a neutral optimization tool to benefit advertisers using DV360, Poirot was designed as a strategic weapon to undermine ad exchange competition while keeping publishers and advertisers in the

---

[5] These auction design mechanics included Dynamic Revenue Share (discussed above in Section VI.G). It also included Reserve Price Optimization (RPO), whereby AdX dynamically adjusted price floors for impression based on expected yield. A simple example illustrates why adjusting price floors in this way made AdX behave more like a first-price auction. If the highest bid for an impression was $2.00 CPM and the second-place bid was $1.00 CPM, then the winning advertiser would normally pay $1.01 CPM in a first-price auction. But if AdX used RPO dynamically raised the floor for the impression to $1.95 CPM, then the advertiser would pay that higher price instead.

dark. This was an obvious and intended side effect of Project Poirot combined with Last Look; DV360 could shade an advertiser's bid into a rival exchange through Poirot, resulting in a lower floor price emerging from the header bidding auction, and then AdX could win the same impression through Last Look.

127.    Third, Google worked to conceal information about Poirot from the exchanges whose bid requests were being targeted and affirmatively acted to stop other exchanges from uncovering the truth about Poirot. Google did not disclose the details of Project Poirot to DV360 advertisers or other exchanges, despite the fact that it impacted DV360 advertisers' ability to win impressions when bidding into those exchanges. Google also "gradually" applied early versions of Poirot into DV360, limiting the amount that bids could be shaded into rival ad exchanges to 40%. This gradual approach made it difficult for exchanges like Magnite to detect that bid-shading in DV360 was causing their revenue decline.

128.    Starting in 2018, Magnite worked internally to investigate why DV360's spend had dropped on its exchange, but Magnite could not determine the cause. Magnite tried its best to reverse the effects of Poirot (all while not knowing it had been implemented) by reviewing its internal data on bidding. Magnite reached out to the DV360 team at Google in an attempt to determine the cause of DV360's reduced spend into their exchange, but no one at Google would tell Magnite the cause of the reduced spend or reveal Project Poirot. Google employees told Magnite that they did not know why DV360's spend was reduced on Magnite's exchange, despite the fact that internally Google acknowledged that a goal (and effect) of Poirot was to lower spend on exchanges like Magnite. Magnite only knew that a customer, DV360, had reduced its spend on Magnite's exchange. Magnite had no way of confirming that its DV360 spend was being diverted away to its competitor, AdX, based on DV360 systematically lowering

its bids into Magnite's exchange because DV360 did not reveal that information to Magnite or the public.

129.    Eventually, in April 2019, a Google employee admitted in a conversation with a Magnite employee that DV360 would soon shift more spend to independent exchanges as a result of reduced bid-shading because Google was facing pressure around antitrust concerns. That employee did not provide any details about Project Poirot to Magnite. Google never revealed the truth about Project Poirot to Magnite, but Magnite did eventually see a lift in spend from DV360 in September 2019, long after the negative effects of Project Poirot had been felt at Magnite and other independent exchanges. The April 2019 exchange came just two months before the U.S. Department of Justice publicly announced it was investigating Google's anticompetitive conduct.

130.    It is revealing that Google also concealed details about Poirot from advertisers— the very parties it claimed to be helping. Other DSPs typically share details about the existence of their bid-shading practices (albeit, not their proprietary bid-shading algorithms) to advertiser clients. Indeed, they market those techniques as premium optimization services and often charge advertisers a fee to participate. That makes sense because other DSPs design their bid-shading strategies to increase advertisers' ROI. DV360, in contrast, hid the fact that it was shading bids into independent exchanges, indicating that Google did not think Project Poirot was designed to benefit advertisers.

131.    DV360's communications about bid-shading to advertisers and the industry were vague, technical, and misleading. The platform included a generic toggle labeled "bid optimization" without explaining that it involved systematic bid suppression targeted at rival exchanges. The notice suggested routine budget management rather than a practice that would

materially alter how DV360 competed in header-bidding auctions. Unlike other DSPs, DV360 never disclosed the scope of its shading, never explained that it applied broadly to all impressions on independent exchanges, and never offered advertisers the choice to opt out or calibrate the feature. This lack of clarity left advertisers unable to understand that their bids were being intentionally weakened in ways that harmed their campaign performance.

132.    The only plausible reason for Google to hide the existence of Poirot from advertisers was to ensure that rival exchanges would not find out about Poirot because its true purpose was to secretly damage competing exchanges while preserving full bidding power for AdX.

133.    The effects of Project Poirot were immediate and drastic. According to data revealed during the *US v. Google* trial, after the first version of Poirot, DV360 advertisers spent 9% more on AdX and 10% less on other exchanges; the second version widened the gap even further, driving revenue and volume away from competitors and back into Google's controlled ecosystem. Liability Op. at 37. By reducing DV360 bids on other exchanges (sometimes by up to 90%), Google made those exchanges less attractive to publishers (since the bid amounts were artificially depressed) and shifted even more advertiser spend back to AdX.

## I.    Google Responds to Antitrust Scrutiny by Dropping Last Look But Introduces Unified Pricing Rules to Enhance Its AdWords-AdX-DFP Tie

134.    By 2019, pressure from both publishers and antitrust enforcers was mounting. Publishers were placing significant pressure on Google over the lack of transparency or fairness in DFP's auction process. Internally, Google acknowledged that its high market shares and self-preferencing policies could lead to intervention by antitrust regulators. Google was concerned that regulators would force it to remove Last Look. Rather than have AdX compete on fair terms with rival exchanges or provide publishers with more transparency, Google simply changed out

one anticompetitive policy for another. Google made a highly publicized change: it announced it would abolish the Last Look advantage and shift AdX to a "first-price" auction model (aligning with what most independent exchanges had already done at the behest of advertisers). Google presented this move as a concession to fairness because it would remove the ability for Google to view rivals' bids and then beat a second-highest bid by a penny. However, this change came with a catch: at the same time, Google implemented Unified Pricing Rules in Google Ad Manager (the new name for DFP).

135.    Google designed Unified Pricing Rules to reinforce the efficacy of the AdWords-AdX-DFP Ties by undermining a tactic publishers had developed to reintroduce more competition to the exchange market.

136.    Even after Google ended Last Look, publishers knew that Google could continue using its superior data to model rivals' bids and cherry-pick impressions at low prices. In essence, Google had accumulated so much data from its publisher ad server monopoly that it no longer needed Last Look to advantage AdX. Now, it could predict with extreme accuracy what rival exchanges' were likely to bid for any particular impression. Then, AdX could submit a bid for just a few pennies more and win the impression just as if it still had a Last Look.

137.    However, publishers had discovered that they could offset AdX's Last Look advantage by setting different "floor prices" within DFP for AdX and other exchanges. When a publisher sets a floor price for a buyer, it means that buyer's bid must meet or exceed the floor price or it would not be considered. Setting different floor prices for different buyers makes sense when a publisher knows that one buyer enjoys systemic advantages over its rivals. Sophisticated publishers realized that if they set higher reserve prices for AdX demand than for other exchanges, then AdX would have to beat its assigned floor, not just the second-highest

bidder's price. Publishers thus began setting higher price floors for AdX compared to rival exchanges in the hope of increasing pricing pressure on AdX. Publishers also did so to diversify their revenue sources and generally reduce their dependence on AdX.

138.    Another added benefit was that publishers had seen an increasing proportion of low-quality ads coming from AdWords via AdX. Setting higher price floors for AdX helped screen out these low-quality ads, breaking apart the AdWords-AdX-AdWords pipeline Google had imposed for a decade.

139.    While setting higher floor prices for AdX was an imperfect solution for publishers, it held the promise of mitigating AdX's advantages from Last Look and its ability to predict rivals' bids based on DFP data. Google's Unified Pricing Rules, however, put an end to that hope. The new rules prohibited publishers from setting floor prices for AdX that were higher than those for other demand sources.

140.    Google claimed that its Unified Pricing Rules were meant to simplify DFP. But as this Court concluded in *U.S. v. Google*, "Google implemented Unified Pricing Rules to enhance the AdX-DFP tie, and not for its proffered justifications." Liability Op. at 110. The best evidence of that fact is that, despite its name, Unified Pricing Rules did not actually require "unified pricing" for all exchanges. DFP publishers could still set a *lower* floor price for AdX, thereby advantaging it over other exchanges. They could just not do the inverse: setting higher AdX floor prices to strategically diversify their revenue sources away from Google.

141.    Google employees admitted as much in internal communications. For example, the AdX team explicitly pushed DFP to implement Unified Pricing Rules as "an opportunity to significantly limit the ability of publishers to set floor prices per buyers" once Last Look was gone. In other words, Google knew it was going to have to give up one overtly unfair advantage

(Last Look), so it traded it out for a subtler, but just as effective policy that still prevented publishers from boosting competition in the auctions.

142.     Despite Google's public claims that Unified Pricing Rules would make auctions "safer and simpler" Google knew that they would lead to reduced revenue for publishers and eliminate one of their only methods of preferencing rival exchanges over AdX. Unified Pricing Rules thus constituted an intentional degradation of the quality of DFP whereby Google removed an important tool publishers had used to increase competition among ad exchanges.

143.     Many publishers immediately protested that Unified Pricing Rules were not in their interests, but because DFP (as a result of its tie with AdX) was the only way to get access to Google's unique demand sources, publishers did not move away from DFP.   Publishers understood that Unified Pricing Rules primarily benefited Google by locking in a single auction structure that Google could optimize to its advantage, without the interference of variable floors that had previously helped publishers extract more value from non-Google exchanges. Even if publishers wished to move to a different ad server, Google had effectively eliminated any viable competitors by 2019. Therefore, Unified Pricing Rules are another example of Google using its monopoly power to reinforce the DFP-AdX Tie and limit customers' freedom to work with rival exchanges.

144.     After Google implemented Unified Pricing Rules in DFP, AdX began to win even more impressions while rival exchanges won fewer impressions and received lower revenues. The AdWords-AdX-DFP Ties also became stronger because it became more difficult for publishers to weed out lower quality ads that were coming from AdWords through AdX and DFP. Unified Pricing Rules thus continued to exacerbate AdX's scale advantage and made it more difficult for rival exchanges to compete.

47

**J.  Google's Anticompetitive Conduct Garners Scrutiny from Antitrust Regulators**

145.        By 2019, Google was on notice that the Department of Justice was investigating its conduct in various ad tech markets. Rather than change course willingly and eliminate its anticompetitive conduct, or work with DOJ to satisfy their concerns, Google doubled down in the face of a potential legal challenge from government antitrust regulators. Google did not end its anticompetitive tying arrangement between DFP and AdX. Instead, while under the specter of DOJ's investigation, Google introduced UPR "to enhance the AdX-DFP tie."  Liability Op. 110. It has now been at least six years since Google was aware that its conduct was facing scrutiny and could violate federal antitrust law, and yet Google has refused to cease abusing its monopoly power in the ad server and ad exchange markets.

146.        Worse still, Google was actively destroying relevant evidence despite being on notice that its conduct was under investigation. Google failed to take necessary steps to preserve key employee's internal chats because it used default "history off" settings that auto-deleted internal conversations, even those that were relevant to DOJ's investigation and should have been preserved. Employees that did not have "history-off" enabled because they were under legal holds routinely told other employees to hold conversations without them present so no record would be preserved.

147.        Despite Google's attempts to frustrate the DOJ's investigation, DOJ and the attorneys general of several states filed a lawsuit alleging violations of federal antitrust laws on January 24, 2023. DOJ's lawsuit focused on the same anticompetitive behavior alleged herein, including the AdWords-AdX-DFP Ties, First Look, Last Look, UPR, and SSDRS.

148.        The DOJ case culminated in a trial in September 2024, where the EDVA Court heard testimony from dozens of witnesses, including employees and former employees of Google's exchange competitors. The Court issued a Memorandum Opinion on April 17, 2025

finding that "Google has violated Section 2 of the Sherman Act by willfully acquiring and maintaining monopoly power in the open-web display publisher ad server market and the open-web display ad exchange market, and has unlawfully tied its publisher ad server (DFP) and ad exchange (AdX) in violation of Sections 1 and 2 of the Sherman Act." Liability Op. 1.

### K.  Google's Anticompetitive Conduct Allows it to Abuse its Scale and Network Effects

149.      AdX has been the direct beneficiary of Google's anticompetitive practices and the DFP-AdX Tie in the form of network effects. Exchanges need access to both publisher inventory and advertiser demand at scale to grow because publishers only work with exchanges that have sufficient demand and advertisers only work with exchanges that can place their demand into sufficient publisher supply. As described above, Google has guaranteed that it will always possess the necessary scale on both sides through its unlawful tie, forcing publishers to access Google's unique demand sources exclusively through AdX, and it has done so at the expense of its advertiser customers and rival exchanges like Magnite.

150.      Similarly, the DFP-AdX Tie, and policies that furthered it like First Look and Last Look, provided AdX with an informational advantage through access to data that DFP denied to rival exchanges. Google has degraded the quality of DFP over time by reducing and removing the types of data that its publisher customers can access and share with rival exchanges (and denying publisher requests to improve data-sharing capabilities), all while sharing that information directly with AdX. That data includes user data on the individuals viewing publisher's impressions and auction data on bids for those impressions. This additional data shared with AdX is the linchpin of a feedback loop wherein AdX uses its informational

advantage to adjust its bidding behavior to win more impressions, further increasing its scale advantage over rivals.

151.    Google keeps publishers in the dark about relevant information through product design choices that are only viable because of its monopoly power. For instance, Google refuses to share information with publishers about DFP user IDs, which means publishers cannot share that information when requesting bids from other exchanges to improve their bids, but it does share that information with AdX. Similarly, Google does not share detailed information on its take rate with publishers and does not tell them anything about their take rate manipulations, despite Publishers requesting that information.

152.    Through a series of distinct, escalating acts designed to further its ties and harm rivals, Google has created an ecosystem where publishers are forced to use Google's ad server to access real-time bids from Google's ad exchange, while in turn Google forces its advertisers to bid through its exchange to reach publisher's inventory.

**L. Magnite's Ad Tech Position Today**

153.    Magnite is a veteran of the open-web display ad exchange market. It has spent over a decade building infrastructure, innovating auction mechanics, and advocating for greater transparency in digital advertising. But despite its early leadership and continued investment, Magnite eventually came to a sobering realization: its opportunity for meaningful growth in open-web display was effectively capped. The market was dominated by Google, which had entrenched its control over the most critical buy-side and sell-side tools, and had tied them together to exclude rivals like Magnite. While Magnite could still grow modestly alongside the overall expansion of digital advertising by competing with other independent exchanges for whatever share escaped Google's grasp, it could not hope to displace or materially compete with Google's ad exchange business.

50

154.     The barriers were not merely technological—they were systemic. Google boxed Magnite and other independent exchanges out of the highest-value impressions, deprived them the ability to connect publishers to Google's vast advertiser demand, and routinely undercut them using DFP's auction mechanics. As a result, Magnite was no longer truly competing against Google for impressions. Rather, Magnite was competing against other independent exchanges for the residual inventory and budgets that remained after Google had taken the first cut. The result was a race for the remainder, in which Magnite was forced to price aggressively, sacrifice margin, and operate under constant threat of being sidelined by another one of Google's policy or product changes.

155.     Google's anticompetitive conduct has caused significant harm to Magnite's business for more than a decade. In 2016, Magnite was forced to cut costs by terminating over 100 of its employees, representing more than 13% of its workforce, to address reduced revenues caused in part by Google's anticompetitive conduct. Magnite further reduced its headcount in 2017 and 2018 by terminating an additional 150 employees.

156.     Recognizing the structural limits it was facing, Magnite began looking beyond the open-web display exchange market for new growth opportunities. Company leadership understood that its long-term success could not depend solely on challenging Google's monopoly head-on. Initially, Magnite began investing in developing more advanced features around other advertising formats, including audio, mobile in-app, and digital out-of-home. However, reduced revenues caused by Google's anticompetitive conduct hindered Magnite's ability to invest in the necessary technical work to expand those product offerings, which hindered adoption of these emerging formats. Magnite eventually had to reprioritize or delay these efforts after it was forced to reduce its workforce.

157.     Next, Magnite sought to diversify into adjacent digital advertising markets—particularly in streaming video and connected TV ("CTV")—that had not yet been captured by Google's ecosystem. These formats were growing rapidly, driven by shifts in consumer behavior and the migration of advertising dollars away from traditional television. Again, Magnite attempted to build out its product offerings internally, assigning product managers and performing work to begin building an exchange that could function in the CTV market. As with other formats, Magnite quickly found that it lacked the resources to invest fully in building products internally because its revenues and cashflows were continually being impacted by Google's conduct. This includes reduced DV360 spend caused by Project Poirot, which Google concealed from Magnite in 2018 and 2019, which were crucial years for Magnite's efforts to expand its product offerings into other formats.

158.     Magnite's strategic shift led to the 2020 merger with Telaria, a company with a strong presence in streaming video and CTV advertising. The merger is what transformed Rubicon Project into "Magnite," which represented a combination of the company's legacy open-web display infrastructure with Telaria's video capabilities to form what was then the largest independent sell-side platform. While Magnite would continue competing in the open-web display stack, the merger reflected a recognition by the company that its ability to grow in that market would always be constrained by Google's exclusionary conduct. The merger was thus designed to enable Magnite to diversify revenue and seek growth opportunities in new digital advertising channels that Google had not yet dominated.

## VII.    RELEVANT MARKETS AND GOOGLE'S MONOPOLY POWER

159.     This case challenges Google's unlawful conduct in monopolizing two of the key technologies publishers use to sell open-web display advertisements. Open-web display ads are digital banner ads and non-streaming video ads (such as in-banner or out-stream video formats

that run within display inventory) that appear on independent websites using third-party ad tech infrastructure to match advertisers with available publisher inventory. The sell-side customers in these markets are digital publishers, ranging from news outlets to entertainment sites to niche blogs. Those publishers depend on selling display ads to monetize their content and make it freely available to users. Without the ability to generate adequate advertising revenue, publishers cannot sustain their businesses or continue producing the content that fuels the open internet.

160.    Open-web display ads are distinct from advertising sold within so-called "walled gardens," such as Facebook, YouTube, or Amazon. In those closed ecosystems, the platform itself owns the user relationships, controls both the supply and demand sides of the market and sells ads directly into its own inventory. The walled gardens also tend to be large, vertically integrated platforms that develop their own in-house ad tech products. By contrast, open-web publishers operate independent websites and must rely on third-party ad tech to connect their available ad space with advertiser demand. Building a walled garden is not a realistic option for most publishers, who lack the scale, the closed ecosystems, or the troves of user data necessary to replicate the model of an Amazon, Facebook, or Google. Their only viable path to monetization is the open-web display ad ecosystem.

161.    Open-web display ads are also not reasonably interchangeable with other forms of digital advertising, such as in-app ads, social media ads, search ads, or instream video ads (i.e., video ads that appear before or during streaming video content). Each format targets users at different points in the marketing funnel and serves distinct purposes for advertisers. Search ads reach consumers at the moment they are expressing intent to purchase; social media ads leverage platform-specific data to influence users within closed networks; in-app ads reach users inside mobile applications; and instream video ads drive brand recognition through audiovisual

storytelling. Display ads on the open web, by contrast, allow advertisers to reach users alongside the content they consume across a wide array of independent sites, offering broad reach and effective targeting. For publishers, these ads represent the central means of monetizing written and visual content distributed on the open internet.

162.    The relevant product markets affected by Google's anticompetitive conduct are the publisher ad server market and the ad exchange market. And while this case centers on the harm to competition in those two markets, Google's anticompetitive conduct also involves activities on the buy-side. Google controls two of the predominate buy-side tools—its AdWords platform (now Google Ads) and its demand-side platform, Display & Video 360. The buy-side market is distinct from the ad exchange and ad server markets, and Google faces more competition there in serving advertisers. But from the perspective of open-web publishers, AdWords and DV360 are vital sources of advertiser demand. Google thus has sufficient market power on the buy-side market to distort competition in the downstream ad exchange and ad server markets that serve open-web publishers.

### A. Publisher Ad Servers for Open-Web Display Advertising

#### 1. Publisher Ad Servers for Open-Web Display Advertising Worldwide Is a Relevant Antitrust Market

163.    In its Memorandum Opinion following trial in *U.S. v. Google*, the Court found that "publisher ad servers for open-web display advertising constitute the area of effective competition and form a relevant antitrust market." Liability Op. at 44.

164.    In reaching its legal conclusion, the Court found that publisher ad servers for open-web inventory are distinct products with unique purposes, features, and pricing. They exist to help publishers manage and monetize their inventory and are priced differently than exchanges or demand-side platforms. Industry participants recognize them as separate products, and the

history of Google's own conduct shows that a monopolist could degrade quality without losing significant customers. The Court further determined that publishers cannot effectively substitute away from open-web display advertising by relying on apps, social media, or other formats, and that certain categories of publishers have no realistic alternative means of monetization. Nor can publishers feasibly build in-house ad serving technology, which requires specialized expertise beyond their core competencies. Finally, other ad tech products, such as the publisher-facing sides of ad networks, are not reasonable substitutes for publisher ad servers. Liability Op. at 44-50.

165.    The Court also concluded that the relevant geographic market for publisher ad servers is worldwide. Publisher ad servers are software products provided over the internet, and publishers across the globe rely on the same tools, features, and pricing structures regardless of location. Because these products are not constrained by geography and publishers cannot turn to region-specific substitutes, competition in publisher ad servers occurs on a global scale. Liability Op. at 69-71.

**2.    Google Possesses Monopoly Power in the Market for Publisher Ad Servers for Open-Web Display Advertising Worldwide**

166.    The Court in *U.S. v. Google* concluded that "Google possesses monopoly power in the publisher ad server for open-web display advertising market" via DFP (now part of Google Ad Manager). Liability Op. at 73.

167.    To support its conclusion that Google possesses monopoly power in the publisher ad server market, the Court cited DFP's overwhelming worldwide market share of "between 91.0% and 93.5%" from 2018 through 2022, "significant barriers to entry and expansion," the difficulties for publishers in switching ad servers, "the lack of meaningful alternatives to DFP,"

and Google's ability to degrade the quality of its product without fear of losing share. Liability

Op. at 73-76.

### 3. Magnite Is a Nascent Potential Competitor in the Market for Publisher Ad Servers for Open-Web Display Advertising Worldwide

168.     Magnite is a nascent and likely competitor in the market for publisher ad servers.

Although historically focused on its exchange business, Magnite operates its own ad server

technology for CTV, one of the fastest-growing segments of digital advertising. This CTV ad

server demonstrates that Magnite possesses the technical expertise, engineering talent, and

product credibility necessary to design and operate ad serving systems at scale.

169.     Magnite's success in CTV ad serving reflects its broader capabilities as an

independent technology provider. Publishers and advertisers recognize Magnite as a trusted

partner with deep experience in real-time bidding, auction design, inventory management, and

yield optimization. Those are the same functions at the heart of open-web display publisher ad

servers. In a competitive market, Magnite would be a natural candidate to expand from CTV into

open-web display ad serving, bringing innovation and much-needed rivalry to a segment long

dominated by Google.

170.     Google has blocked Magnite's entry, however, through its exclusionary conduct.

By tying AdX to DFP, denying rival ad servers access to critical demand and data, and leveraging

its buy-side power to foreclose competition, Google has ensured that no independent company,

even one with Magnite's expertise and credibility, can viably challenge its DFP's dominance. In

the absence of Google's unlawful restraints, Magnite would have had a meaningful opportunity

to expand into open-web display ad serving.

171.     Indeed, Magnite has considered entering the publisher ad server for open web-

display market several times over the past decade, either through building its own ad server or

through a strategic acquisition. But every time Magnite considered the possibility of entry it concluded that Google's insurmountable monopoly position made entry untenable.

**B. Ad Exchanges for Open-Web Display Advertising**

    **1. Ad Exchanges for Open-Web Display Advertising Worldwide Is a Relevant Antitrust Market**

172.      In its Memorandum Opinion following trial in *U.S. v. Google*, the Court found that "ad exchanges for open-web display advertising constitute a distinct relevant product market." Liability Op. at 50.

173.      Ad exchanges are a distinct product in the open-web display ad tech stack that serve customers on both the sell-side and the buy-side. Exchanges serve the unique function of connecting publishers using ad servers with advertisers using programmatic buying tools, and they alone can collect and rank bids from multiple buyers in milliseconds. Industry participants treat ad exchanges as a separate category, and their pricing structure—percentage-based fees per impression sold—differs from the pricing of publisher ad servers and demand-side platforms. The Court further determined that neither ad networks nor direct deals are reasonable substitutes: networks lack the ability to place disparate demand sources in competition, and direct deals cannot replicate the efficiencies and advantages of programmatic, real-time bidding. Finally, the Court found that an exchange monopolist could sustain supracompetitive prices without significant substitution, citing Google's own study showing that a 25% price cut would have little effect on AdX's market share. Liability Op. at 50-53.

174.      The Court also concluded that the relevant geographic market for ad exchanges is worldwide. Like publisher ad servers, ad exchanges operate as internet-based platforms that publishers and advertisers use without regard to geography. The same exchanges compete to match impressions with bids across borders, using uniform technology and pricing structures.

Because publishers cannot turn to region-specific alternatives, and advertisers demand global reach, competition among ad exchanges occurs on a global scale. Liability Op. at 69-71.

### 2. Google Possesses Monopoly Power in the Market for Ad Exchanges for Open-Web Display Advertising Worldwide

175.    The Court in *U.S. v. Google* concluded that "Google possesses monopoly power in the ad exchange for open-web display advertising market" via AdX (now part of Google Ad Manager). Liability Op. at 76.

176.    To support its conclusion that Google possesses monopoly power in the ad exchange market, the Court cited Google's worldwide market share of between 63% and 71% from 2018 to 2022, Google's ability to charge "durable supracompetitive prices" of 20% over the period, Google's unwillingness to lower its prices even while other exchanges do so, its refusal to negotiate prices, and the fact that publisher customers did not leave AdX despite its relatively higher prices. Liability Op. at 76-77, 82. The Court also cited internal Google documents admitting that AdX's prices were "irrationally high" but that lowering its fees would not significantly affect customer retention.

177.    The Court also found that AdX's monopoly position is protected by high barriers to entry and expansion. Scale and network effects are central to ad exchanges, which exist to match publisher inventory with advertiser demand. The more customers and transactions an exchange attracts on both sides, the more it benefits from economies of scale and the accumulation of auction and targeting data. That data, in turn, can be used to conduct rapid experiments, refine machine-learning algorithms, and improve the accuracy and efficiency of matching publishers with advertisers.

### 3. Magnite Competes in the Market for Ad Exchanges for Open-Web Display Advertising Worldwide

178.     Magnite is a direct competitor in the market for ad exchanges for open-web display advertising worldwide.

179.     Over the years, Magnite invested heavily in auction design, yield optimization, and data analytics, positioning itself as the largest independent ad exchange focused on the open web. Magnite competed by offering publishers and advertisers an open alternative to Google's vertically integrated stack. Publishers turned to Magnite for tools such as header bidding and quality controls that increased competition and improved monetization of their ad inventory. Advertisers valued Magnite's reach across premium publishers and its efforts to create a more transparent, efficient, and brand safe marketplace.

180.     Despite Magnite's innovations and credibility with publishers and advertisers, Google artificially constrained Magnite's growth. Google's tying of AdX to its publisher ad server, its preferential routing of AdWords demand, and its exclusionary restrictions deprived Magnite of fair access to the scale and demand needed to compete effectively.

## C. Buy-side Tools for Display Advertising

### 1. Buy-side Tools for Display Advertising Worldwide Is a Relevant Antitrust Market

181.     Google monopolized the worldwide markets for open-web display publisher ad servers and ad exchanges in part through conduct in the adjacent, but separate market for advertiser display ad-buying tools. That is a distinct market consisting of ad tech tools that enable advertisers to buy various categories of display ads, including open-web display ads, walled-garden display ads, in-app display ads, and social media display ads.

182.     Products in the display ad-buying tools market include the buy-side of open-web display ad networks, such as Google's AdWords. It also includes DSPs, such as Google's

DV360. The unifying characteristic of these products is that they are advertiser tools used to place bids on programmatic display ad inventory across one or more exchanges.

183.     The relevant product market is defined by the functional interchangeability and competitive dynamics of advertiser tools that perform the same basic function: enabling advertisers to bid on and acquire programmatic display ad inventory. While these tools differ in interface, reach, and integration, they share core characteristics. Buy-side tools for display advertising provide advertisers with the ability to manage campaigns, set targeting parameters, and place bids in real time.

184.     Substitutes outside this category, such as manual direct buys or traditional print advertising, are not reasonably interchangeable with buy-side tools for display ads because they lack programmatic functionality and do not offer comparable efficiency, targeting, or scale. Nor are tools used for buying search ads a viable substitute for the products in this market. As the court ruled after trial in *U.S. v. Google*, search and display ads have different characteristics and uses, and industry participants and the public recognize them as distinct. Search Liability Op. at 166-74.

185.     As with publisher ad servers and exchanges, the market for buy-side display ad-buying tools is global in scope. Advertisers with multinational campaigns require tools that allow for the purchase of impressions across geographies in real time. Vendors of these tools compete for business worldwide, and advertisers typically deploy a single DSP or campaign management platform across multiple regions rather than sourcing separate tools for each local market.

2.  **Google Possesses Sufficient Power in the Market for Buy-side Tools for Display Advertising to Constrain Competition in the Exchange Market**

186.     Google may not possess monopoly power in the market for buy-side tools for display ads, but it does have sufficient market power to enable it to restrict competition in the adjacent market for open-web display ad exchanges.

187.     Google operates two buy-side tools for display ads: AdWords and DV360. AdWords, now known as Google Ads, aggregates demand from millions of mostly small and medium-sized advertisers, many of whom use it as their exclusive tool for buying digital advertising. Because AdWords advertisers are primarily interested in simple, turnkey campaigns and lack the resources to manage multiple buying platforms, access to AdWords demand is essential for publishers seeking to monetize their inventory.

188.     DV360, by contrast, is Google's enterprise demand-side platform used by larger, more sophisticated advertisers and agencies. DV360 offers granular controls, data integrations, and optimization tools that allow these advertisers to run programmatic campaigns at scale across multiple exchanges. For many publishers, DV360 represents one of the single largest sources of programmatic demand.

189.     From the perspective of publishers, both AdWords and DV360 are "must-have" sources of demand. Without access to the advertisers aggregated through these tools, publishers would lose substantial revenue. This dependence gives Google the ability to dictate how and where that demand flows.

190.     The Court in *US v. Google* explained that Google itself knew its control over AdWords demand gave it the power to coerce publishers on the other side of the exchange market:

> [AdWords'] ease of use, association with a preeminent Internet company, and ability to place targeted advertisements alongside

Search results attracted millions of unique advertisers, including countless small and medium-sized businesses. Although publishers could offer their impressions on non-Google ad exchanges, large publishers were greatly attracted to the unique advertising demand offered by AdWords, and as a result viewed using DFP as essential because it was the only publisher ad server that could effectively access AdX and, consequently, AdWords demand. Google recognized the unique attractiveness of its extensive advertiser demand, and its employees understood that limiting access to AdWords demand in this way "compel[led] publishers" to use AdX and DFP.

Liability Op. at 29.

191.     The same dynamic applies to DV360. By controlling one of the most important DSPs for large advertisers and agencies, Google possesses the ability to shape competitive outcomes in the exchange market. When DV360 demand is suppressed on rival exchanges or privileged for AdX, publishers lose access to one of their largest and most valuable revenue streams, and independent exchanges like Magnite are deprived of the scale they need to compete.

## VIII.   ANTICOMPETITIVE EFFECTS AND ANTITRUST INJURY

192.     Google's exclusionary campaign directly injured Magnite by depriving it of the opportunity to compete on the merits. Magnite was a well-positioned rival with proven technology, publisher trust, and innovative tools. But Google's exclusionary scheme relegated Magnite to a secondary status in the exchange market, competing against other independent exchanges for impressions Google did not take. Google's monopolization of the open-web display ad exchange market restricted Magnite's profits in three primary ways.

193.     First, Google deprived Magnite of the ability to connect its publisher customers to the most important sources of advertiser demand. By walling off its dominant buy-side tools through an illegal tie with AdX, Google ensured that publishers working with Magnite could not access the same budgets available through Google's stack. That, in turn, made Magnite less attractive to publishers and reduced the number of impressions it could serve.

194.     The clearest example was AdWords. If the exchange market had been competitive, Google would have had no incentive to restrict AdWords demand exclusively to AdX. Internal Google documents revealed at trial confirmed that Google's own buy-side team wanted AdWords demand to flow into independent exchanges like Magnite's, but Google deliberately withheld that demand to favor AdX. Absent that tie, AdWords would have bid through Magnite's exchange, significantly increasing its scale, allowing it to win more impressions, and generating substantially greater revenue.

195.     Project Poirot was a way for Google to extend the same exclusionary strategy to DV360. As with the AdWords-AdX Tie, DV360's bid-shading implementation was designed not to optimize outcomes for advertisers but to suppress bids placed on independent exchanges. Rather than employing impression-level shading algorithms that would have treated all exchanges equally, DV360 imposed across-the-board reductions in bids routed to rivals like Magnite. This artificial suppression meant Magnite received lower bids than it should have, causing it to lose impressions and the associated fees. In a competitive market, DV360 would have sent higher bids to Magnite, enabling it to secure more transactions and expand its scale.

196.     Second, Google manipulated the auction mechanics within its publisher ad server, DFP, to give AdX a systemic, impression-by-impression advantage. These discriminatory rules distorted outcomes even when Magnite offered publishers and advertisers the more competitive bid.

197.     Through "First Look," AdX was allowed to see and buy impressions before rival exchanges, including Magnite, could even place a bid. This meant Magnite lost impressions even when its advertisers were willing to pay more. Each impression diverted through First Look was a lost transaction and lost fees for Magnite.

198.     Google compounded the harm with "Last Look," which withheld AdX's final bid until after all competing bids were submitted. That guaranteed AdX the ability to outflank Magnite at the last second, displacing Magnite even when its advertisers had initially submitted the highest bid. Dynamic Revenue Share (SSDRS) and Unified Pricing Rules further stacked the deck by allowing AdX to manipulate take-rates and floor prices in ways that consistently advantaged itself over independent exchanges. These mechanisms ensured that AdX would capture impressions Magnite otherwise would have won.

199.     Third, Google's tying of DFP and AdX deprived Magnite of the data that is essential for exchanges to improve their competitiveness. Because AdX intercepted impressions via First Look before Magnite ever saw them, Magnite lost the ability to analyze bidding behavior, clearing prices, and auction outcomes. Without this iterative feedback, Magnite could not refine its algorithms to help its publishers maximize yield.

200.     The same was true under Last Look, which prevented Magnite from seeing the final winning bid. That denied Magnite the competitive intelligence needed to adjust its strategy and sharpen its pricing models. By walling off both impressions and data, Google entrenched AdX's advantage while starving Magnite of the information and scale required to grow. The loss of scale was arguably more important to Magnite, as it not only caused Magnite to experience reduced revenues and profits, but it denied it the necessary data to improve its technology and compete more effectively for impressions.

201.     Google's conduct also injured Magnite by preventing it from entering and competing effectively in the publisher open-web display ad server market. Magnite had the expertise, technology, and credibility to expand into ad serving. It was already one of the largest independent exchanges and, through its connected television business, developed and operated

an ad server with functionality analogous to publisher ad servers for display. Magnite thus possessed the technical capabilities and customer relationships necessary to compete in this adjacent market.

202.    In a competitive environment, Magnite would have been a natural entrant into open-web ad serving. Its reputation for transparency, publisher trust, and innovation made it a logical alternative to Google's DFP. By leveraging its existing exchange relationships, Magnite could have offered publishers a fully integrated platform that combined ad serving and exchange services, enhancing competition on both price and quality. Indeed, Magnite has had success with its integrated ad server and exchange offerings in CTV, a market that does not suffer from Google's dominance and anticompetitive conduct.

203.    But Google's exclusionary conduct made such entry commercially infeasible. By tying AdX exclusively to DFP and withholding critical demand from rival ad servers, Google eliminated the viability of any new ad server, regardless of its merits. Publishers considering an alternative ad server faced a prohibitive penalty: losing access to AdWords demand, the single largest pool of advertiser spending. As a result, Magnite—despite its readiness and capability— was foreclosed from expanding into ad serving and lost the revenue, scale, and competitive opportunities that such an expansion would have brought.

204.    Google's monopolization of the ad server also harmed Magnite's exchange business in another way. Google's tying of AdX to its monopoly DFP undermined Magnite's ability to service programmatic direct and PMP transactions. AdX enjoyed exclusive access to proprietary DFP APIs necessary for delivering programmatic direct and PMP purchases. It was far easier for publishers to set up and run their programmatic direct deals and PMP deals through AdX. In a competitive market, an ad server would have every incentive to make APIs equally

65

available to all qualified exchanges because these Open APIs would make their product more attractive to publisher clients. But under Google's exclusionary scheme, publishers that wanted to execute PMP deals through Magnite or other independent exchanges faced significant additional operational burdens. Setting up the same deals outside of AdX required far more manual intervention and effort from publishers' ad operations teams, making it impractical at scale.

205.     Google also used its ad server monopoly to steer programmatic direct and PMP deals into AdX and away from rivals. Publishers using DFP were pressed to establish those deals within AdX's system, rather than through Magnite or another exchange. When Magnite approached DFP publishers to run programmatic direct or PMP deals on its platform, Google warned publishers that doing so would trigger higher fees or less favorable treatment in DFP. In a competitive market, publishers could have turned to another ad server that would not tolerate such coercion. But with DFP as the only viable ad server, Google was able to channel programmatic direct and PMP deal flow to AdX and foreclose Magnite from competing on equal terms.

206.     Due to Google's monopolization of the ad server market, most DFP publishers defaulted to running their programmatic direct and PMP deals through AdX, depriving Magnite of the opportunity to compete for this business and denying it the transaction fees it would have earned in a fair market.

207.     The injury to Magnite is therefore multi-faceted: Magnite lost profits in the exchange market due to Google's exclusionary tactics, it also lost the ability to compete in the ad server market, and it lost the ability to compete to serve programmatic direct and PMP deals..

208.        Google's conduct did not just harm Magnite; it harmed customers on both sides of the market. Google deprived publishers of the benefits of genuine competition among exchanges and ad servers, including higher yields, better transparency, and more control over how their inventory was monetized. Google also harmed advertisers because Google's restraints meant their bids were not routed to the channels where they could generate the greatest value. By suppressing competition, Google insulated itself from pressure to improve quality, lower fees, or provide greater visibility into auction mechanics. The result was lower revenues for publishers, higher costs for advertisers, and less innovation throughout the ad tech stack.

## IX. <u>STATUTE OF LIMITATIONS</u>

209.        Google's anticompetitive conduct described above constitutes a continuing violation of the antitrust laws. It cannot be understood as a series of discrete, separate acts to incrementally increase Google's market power in exchanges and ad servers. Rather, it is a comprehensive scheme to create an end-to-end ad tech pipeline and lock in publishers. Google repeatedly adjusted that scheme over more than a decade to maintain the lock-in and to fend off efforts by publishers to escape Google's control.

210.        Google's scheme began in 2009 with the tying of AdWords to AdX and AdX to DFP. Google has maintained those interconnected ties to this day, reaffirming them repeatedly even when Google's own buy-side employees suggested loosening the ties to benefit AdWords advertisers. Google also reaffirmed and enhanced the ties through policies and practices designed to undermine efforts by publishers and competitors to break apart DFP, AdX, and AdWords. Those policies and practices include, First Look, Last Look, SSDRS, Project Poirot, and, most recently, Unified Pricing Rules. *See* Liability Op. at 110 ("strong evidence that Google implemented Unified Pricing Rules to enhance the AdX-DFP tie, and not for its proffered justifications").

211.      Google also engaged in fraud to conceal two core practices that drove Magnite's injuries: SSDRS and Project Poirot. Google took affirmative steps to hide those practices from competitors, its customers, and even antitrust enforcers. Magnite exercised reasonable diligence, repeatedly asking Google to explain anomalous shifts in Google's DV360 spend, but Google either professed ignorance, gave pretextual explanations, or affirmatively misled Magnite.

212.      Google introduced SSDRS in 2015 and, at first, operated SSDRS entirely in secret. Later, when it publicly described SSDRS in 2016, Google portrayed it as a way to "increase publisher yields." That was false. SSDRS did not increase publisher yields because every discount that Google applied to make a bid more competitive was later offset by a surplus fee applied to other impressions. In reality, SSDRS's purpose and effect was to use AdX's information advantage from its tie-in with DFP to gain an anticompetitive advantage. This concealed price manipulation harmed competition and, as a result, ultimately suppressed publisher revenue.

213.      Neither publishers nor competing exchanges such as Magnite had any reason to know that SSDRS was actually a price-manipulation mechanism. Nor was there any ability for them to reasonably discover Google's misconduct. Google's invoices to publisher customers have not listed its take rate on an impression-by-impression basis, so has been impossible to glean information from them that would tip off publishers as to what Google was actually doing. Competing exchanges, such as Magnite, were in an even worse position to investigate Google's conduct.

214.      Google's fraudulent concealment with respect to Project Poirot was just as egregious. Google launched Project Poirot to advantage AdX by reducing DV360's bids on rival exchanges while leaving AdX bids untouched. This reduced the prices DV360 advertisers paid

when buying through Magnite and other independent exchanges, starving them of revenue and scale, while steering transactions back into AdX.

215.    As explained above, Project Poirot was not a typical bid-shading program. Standard bid-shading tools help DSPs optimize advertisers' ROI by strategically lowering bids on an impression-by-impression basis according to objective criteria. That is why DSPs typically disclose their use of bid-shading. It is a feature that can be attractive to advertisers, and some DSPs even charge for it. Project Poirot, in contrast, was applied selectively and discriminatorily. The purpose was not maximizing ROI for DV360 advertisers, which is why Google hid it from the public.

216.    After Google implemented Project Poirot in 2017, Magnite reached out to Google representatives multiple times to inquire as to why DV360 spend was decreasing. In each case, Google's employees either feigned ignorance or ignored Magnite's request for answers.

217.    Google also structured Project Poirot to avoid detection. In its first year, Poirot shaded bids only 10–40%. This produced modest declines in spend to Magnite that were difficult to distinguish from ordinary "noise" or potentially legitimate bid-shading techniques. Only later did Google ramp up its discriminatory shading to as much as 90%. By gradually increasing and dynamically varying the shading, Google made it impossible for Magnite to determine whether the decrease in DV360 spend was due to Google's manipulation or exogenous factors.

218.    By 2019, Google was being investigated by the DOJ for anticompetitive conduct in ad tech markets. Despite being aware of the investigation, Google actively destroyed relevant evidence. Google used a default "history off" setting for internal chat conversations that auto-deleted messages, even those that were relevant to DOJ's investigation and should have been preserved. Google encouraged its employees to use these "history-off" chats to discuss sensitive

topics specifically so the exchanges would not be preserved and could not be discoverable in an investigation or litigation. Google employees used these "history-off" chats to communicate about business matters even when they knew they were subject to litigation holds that required them to preserve documents. Google itself made compliance with litigation holds difficult for employees because the default setting was "history-off" and employees under legal holds needed to affirmatively turn the setting off to preserve records pursuant to their litigation hold obligations. Employees that did not have "history-off" enabled because they were under legal holds routinely told other employees to hold conversations without them present so no record would be preserved. In addition to using "history-off" chats to exchange information that should have been preserved, Google employees were also directed to make pretextual claims of privilege, including marking documents as privileged or adding internal lawyers to email chains that did not contain or seek legal advice.

219.    Magnite only discovered relevant details regarding SSDRS and Project Poirot on January 14, 2022, when the State of Texas included allegations about both projects in its Third Amended Complaint filed in its own case against Google. *See Texas, et al v. Google LLC,* 1:21-md-03010-PKC (S.D.N.Y. 2022) (ECF No. 195). Even then, the details included in Texas' Complaint about Project Poirot were minimal and did not identify Magnite as a target of Poirot. It wasn't until far more detailed allegations appeared in the January 24, 2023 Complaint in *U.S. v. Google* that Magnite had sufficient information to believe it had been targeted by Project Poirot, which was confirmed at trial.

## X.  CLAIMS ALLEGED

**COUNT ONE**
**Monopolization and Monopoly Maintenance**
**of the Open-Web Display Ad Exchange Market**
**(Sherman Act § 2)**

220.     Magnite restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set for here.

221.     The market for open-web display ad exchanges in the United States or, in the alternative, worldwide is a relevant antitrust market, and Google has monopoly power in that market.

222.     Magnite is a competitor in the worldwide market for open-web display ad exchanges.

223.     Google has unlawfully monopolized the worldwide market for open-web display ad exchanges through an exclusionary course of conduct consisting of the anticompetitive acts described herein. Each of Google's interrelated and interdependent actions increased, maintained, or protected its ad exchange monopoly, and they had a cumulative and synergistic effect that has harmed competition and the competitive process. The following exclusionary conduct, taken together, played a particularly important role in unlawfully establishing or maintaining an ad exchange monopoly:

(1)     the AdWords-AdX Tie;

(2)     the AdX-DFP Tie;

(3)     First Look;

(4)     Last Look;

(5)     SSDRS;

(6)     Project Poirot; and

(7)     Unified Pricing Rules.

224.     Google's exclusionary conduct has drastically altered the supply paths through which available display advertising inventory is sold, reducing payouts to publishers, burdening

advertisers and publishers with lower-quality matches of advertisements to inventory, and inhibiting choice and innovation across the ad tech stack.

225.      Google's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Google's anticompetitive and unlawful conduct.

226.      Google's exclusionary conduct violated and continues to violate Section 2 of the Sherman Act, which prohibits "monopoliz[ing]… any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. §2.

227.      Google's exclusionary conduct foreclosed Magnite's ability to compete in the worldwide market for open-web display ad exchanges. Google has harmed Magnite in a manner that the antitrust laws were intended to prevent. Magnite has suffered and continues to suffer substantial damages and irreparable injury to its business or property as a direct and proximate result of Google's unlawful conduct. Magnite will subsequently quantify the monetary damages caused by Google's unlawful conduct. Magnite is entitled to treble damages for Google's violations of the Sherman Act as well as injunctive relief ending that conduct.

**COUNT TWO**
**Monopolization and Monopoly Maintenance**
**of the Open-Web Display Publisher Ad Server Market**
**(Sherman Act § 2)**

228.      Magnite restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set for here.

229.      The market for open-web display publisher ad servers in the United States or, in the alternative, worldwide is a relevant antitrust market, and Google has monopoly power in that market.

230.      Magnite is a likely entrant and nascent competitor in the worldwide market for open-web publisher ad servers.

231.    Google has unlawfully monopolized the worldwide market for open-web display publisher ad servers through an exclusionary course of conduct consisting of the anticompetitive acts described herein. Each of Google's interrelated and interdependent actions increased, maintained, or protected its ad server monopoly, and they had a cumulative and synergistic effect that has harmed competition and the competitive process. The following exclusionary conduct, taken together, played a particularly important role in unlawfully establishing or maintaining an ad server monopoly:

    (1)    the AdWords-AdX Tie;

    (2)    the AdX-DFP Tie;

    (3)    First Look;

    (4)    Last Look;

    (5)    SSDRS;

    (6)    Project Poirot; and

    (7)    Unified Pricing Rules.

232.    Google's exclusionary conduct has drastically altered the supply paths through which available display advertising inventory is sold, reducing payouts to publishers, burdening advertisers and publishers with lower-quality matches of advertisements to inventory, and inhibiting choice and innovation across the ad tech stack.

233.    Google's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Google's anticompetitive and unlawful conduct.

234.    Google's exclusionary conduct violated and continues to violate Section 2 of the Sherman Act, which prohibits "monopoliz[ing]… any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. §2.

235.      Google has caused Magnite to suffer substantial damages as a direct and proximate result of its unlawful tying arrangement. By restricting competition in the ad server market, Google prevented Magnite from competing in that market and undermined Magnite's exchange business by preventing it from winning ad impression and earning the associated revenue. Google also prevented Magnite from serving programmatic direct and PMP deals and earning the associated revenue. Magnite suffered these damages for reasons that have nothing to do with the merits of Google's products.

236.      Google has harmed Magnite in a manner that the antitrust laws were intended to prevent. Magnite has suffered and continues to suffer substantial damages and irreparable injury to its business or property as a direct and proximate result of Google's unlawful conduct. Magnite will subsequently quantify the monetary damages caused by Google's unlawful conduct. Magnite is entitled to treble damages for Google's violations of the Sherman Act as well as injunctive relief ending that conduct.

## COUNT THREE
### Unlawful Tying
### (Sherman Act § 1 and Clayton Act § 4)

237.      Magnite restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth here.

238.      Google's AdWords, AdX, and DFP are separate and distinct products. They are sold in different markets; their functions are different; there is separate demand for them; and they have been treated by Google and by other industry participants as separate products.

239.      Google's AdX has sufficient market power in the market for ad exchanges for open web display advertising in the United States to coerce publishers to license DFP as an ad server, thus restraining competition in the market for publisher ad servers for open web display advertising in the United States. AdX was viewed as a "must-have" product in part because of its

exclusive access to Google Ads' demand. Google compels publishers to use DFP to access real-time bids from AdX. The only viable economic option for many publishers is to use DFP because choosing a rival platform would require the publisher to lose access to economically essential, unique advertiser demand.

240.     Google's tying arrangement affects a not insubstantial volume of commerce in the publisher ad server market.

241.     Google's tying arrangement has substantially foreclosed competition in the publisher ad server market.

242.     Google has caused Magnite to suffer substantial damages as a direct and proximate result of its unlawful tying arrangement. By restricting competition in the ad server market, Google prevented Magnite from competing in that market and undermined Magnite's exchange business by preventing it from winning ad impression and earning the associated revenue. Google also prevented Magnite from serving programmatic direct and PMP deals and earning the associated revenue. Magnite suffered these damages for reasons that have nothing to do with the merits of Google's products.

243.     Google has harmed Magnite in a manner that the antitrust laws were intended to prevent. Magnite has suffered and continues to suffer substantial damages and irreparable injury to its business or property as a direct and proximate result of Google's unlawful conduct. Magnite will subsequently quantify the monetary damages caused by Google's unlawful conduct. Magnite is entitled to treble damages for Google's violations of the Sherman Act as well as injunctive relief ending that conduct.

## XI.     DEMAND FOR JURY TRIAL

244.     Magnite hereby demands a jury trial for all issues so triable.

## XII.    <u>PRAYER FOR RELIEF</u>

Plaintiff Magnite, Inc. requests that, following a jury trial in this case, the Court enter judgment in its favor and against Defendant Google LLC as follows:

A.    That the Court declare, adjudge, and decree that Google has committed the violation(s) of Sherman Act Sections 1 and 2 alleged herein;

B.    That the Court award damages recoverable under the federal antitrust laws, trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

C.    That Google, its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns, and all of those in active concert and participation with any of the foregoing persons or entities be enjoined and restrained permanently from the unlawful conduct;

D.    That the Court enter structural relief as needed to cure any anticompetitive harm;

E.    That the Court award to Magnite its reasonable costs and expenses incurred in connection with this action, including expert fees and attorneys' fees; and

F.    That the Court grant Magnite such other and further relief as the Court deems just and proper.

Dated: September 16, 2025                          Respectfully Submitted


                                            _____/s/ _Patrick Greco_____
                                            Patrick Greco (Va. Bar No. 90756)
                                            Brandon Kressin (*pro hac vice* forthcoming)
                                            Richard Powers (*pro hac vice* forthcoming)
                                            Kressin Powers LLC
                                            400 Seventh Street NW, Ste 300
                                            Washington, DC 20004
                                            Patrick@kressinpowers.com
                                            Brandon@kressinpowers.com
                                            Richard@kressinpowers.com

                                            Charles B. Molster III (Va. Bar No. 23613)
                                            The Law Offices of Charles B. Molster, III PLLC
                                            2141 Wisconsin Avenue, N.W., Suite M
                                            Washington, D.C. 20007
                                            (202) 787-1312
                                            cmolster@molsterlaw.com

                                            Counsel for Magnite